## APPEAL OF CHARLES S. KEYSER.

[Estate of Henry Seybert.]

FROM THE DECREE OF THE ORPHANS' COURT OF PHILADEL-
PHIA COUNTY.

Argued January 17, 1889—Decided January 28, 1889.

*(a)* In the distribution, in 1887, of the estate of a decedent dying in 1883, a claim was made for the payment upon a quantum meruit for personal services alleged to have been rendered under an employment begun in 1878, and continuing thereafter until the decedent's death.

*(b)* On the hearing, it was shown that in 1879 a different and special contract was set up by the claimant to the deceased, which the latter at once repudiated, and that in 1884 demand had been made of the executors for payment of the claim as afterwards presented.

1. The Orphans' Court having found that the relation between the parties, in the performance of the services claimed for, was not that of employer and employee, the finding of that court upon the question of fact must be accepted where error is not clearly made to appear.

2. The statute of limitations commenced to run not later than 1879, was not stopped by the death of the decedent in 1883, nor by the presentation of the demand to the executors in 1884, and the claim when made upon the adjudication in 1887 was therefore barred.

3. The statute of limitations may be set up in the Orphans' Court, precisely as in a court of law; nor can it be tolled by anything short of a suit at law, or what is its equivalent, in the Orphans' Court, and a demand upon an executor or administrator is not such an equivalent: Yorks' App., 110 Pa. 77, explained and re-affirmed.

Before Paxson, C. J., Sterrett, Clark, Williams, Mc-Collum and Mitchell, JJ.

No. 36 July Term 1888, Sup. Ct.; court below, No. 159 January Term 1887, O. C.

On June 14, 1887, the first account of George S. Pepper, et al., executors of the will of Henry Seybert, deceased, was called for adjudication before Penrose, J., when a claim was presented on behalf of Charles S. Keyser, " for literary services rendered the decedent between 1877 and the time of his death in 1883, one continuous service, $3,000."

From the testimony adduced upon the hearing it was shown

Adjudication.

that the decedent died March 3, 1883, unmarried and without issue, leaving a will admitted to probate March 14, 1883 ; that the account of the executors, showing a balance after the payment of the legacies credited in the distribution, of $765,403.23, had been filed in obedience to a citation issued upon the petition of Charles S. Keyser, the claimant, filed February 5, 1887 ; that the literary work in respect of which the claim was made was the composition and writing of a manuscript work entitled The Chronicles of Independence Hall, upon which the claimant was engaged for a number of years, and it was estimated by witnesses that the value of the labor upon the manuscript was from $3,000 to $6,000.

Witnesses were called by the claimant to establish that the deceased, in 1876, having presented to the city of Philadelphia the new bell and clock now in the steeple of Independence Hall, the writing of said history was undertaken by the claimant at the suggestion of the decedent: that the decedent was frequently in consultation with the claimant, and about three or four months prior to his death he had an interview with Mrs. Elizabeth S. Bladen, a literary lady, to whom he rehearsed the history of his gift, and said to her "that he had engaged Mr. Keyser to write a history of the State House, the importation of the bells, and the things connected with them, and his father and mother—I think he mentioned that particularly, but that he wanted some more elaboration about his personal family, and that possibly I could do it; . . . . . then he said to me would I go down and see Mr. Keyser, and see how cheaply I could get this work from him. . . . . I went down and called on Mr. Keyser. . . . . I went back. Mr. Seybert was still in his parlor. I said to him, 'Why, Mr. Keyser says he would not give you that for less than $2,000; that is his lowest price for it.' Mr. Seybert said, 'Oh, no, no, no; the occasion for it has gone by; go back and see him again, he will give it for a few hundred.' I then observed that he was weak. I got tired of the whole thing."

The auditing judge, upon the foregoing and the other testimony ruled that it was not shown by the claimant that the relation of the parties was that of employer and employee and that the decedent was to pay for and become the proprietor of

Adjudication.

the work, or that the compensation of the claimant was to be derived from any other source than sales made after publication. Referring specially to the testimony of Mrs. Bladen, the adjudication proceeded:

This testimony, in the opinion of the auditing judge, completely negatives the idea of the existence, at the time to which it relates, of any obligation on the part of the decedent to pay for the work done by Mr. Keyser. Mrs. Bladen was sent, not to bring about a settlement of a claim, but to purchase a work which could not have been sold by the author if he had written it simply as an employee; and his refusal to sell at less than $2,000 is inconsistent with the idea that the decedent was already bound to pay for his services what they were reasonably worth.

The decedent was a man of large fortune, and any obligation on his part could readily be enforced. So far as appears there was at no time while he lived an assertion of liability or a demand upon him by the claimant. It would seem that the work was in shape for publication at least as early as 1882, and possibly a year or two before that. If the decedent was to pay for the composition and writing of the book, the manuscript and copyright would of course become his; but the manuscript was not tendered to him in his lifetime or to his executors after his death. The evidence of Mr. Edwin E. Simpson, another witness for the claimant, shows that as long ago as 1878 or 1879 the decedent refused to recognize the right of the claimant to call upon him for the payment of expenses contracted in the preparation of the book; while the following receipt given by Mr. Simpson as agent for the claimant establishes affirmatively the fact that the author was regarded as the owner:

"Received, Philadelphia, January 30th, 1879, of Mr. Henry Seybert, the manuscript of Independence Hall and books loaned to Mr. Seybert by Mr. Keyser.

EDWIN E. SIMPSON for C. S. Keyser."

Claims against the estates of dead men, not asserted while the alleged debtor is living, ought to be supported by the clearest and most convincing evidence. Admissions to third persons are not of this character. As was said in Harbold v. Kuntz, 16 Pa. 214: "Admissions are the easiest mode of tes-

Adjudication.

timony to lead to error, the kind of evidence most apt to be misapprehended and mistaken, and in relation to which a facile conscience may stretch itself like India rubber." No stretching, however, of the admissions in this case can render them sufficient to sustain the claim in support of which they are offered, and the claim must therefore be dismissed.

Before confirmation of the adjudication, the hearing was opened upon the petition of the claimant, for cause therein set forth, whereupon the claimant showed that on January 17, 1874, his counsel had addressed a note to the executors of Mr. Seybert stating that he held the claimant's demand against the estate for literary services, which were fully described, and that a few days thereafter the counsel for the executors had called and stated that payment of the demand was refused and that they would accept service of a writ. Other testimony was presented sufficiently appearing in the supplemental adjudication by Penrose, J., which was as follows:

Upon the testimony submitted, apart from the question of the propriety of considering it at all, under all the circumstances of the case, the auditing judge sees no reason for changing the views expressed in the original adjudication.

The supplemental examination of the witnesses is merely as to matters of explanation, not affecting the merits of the case. The witnesses simply say, perhaps with more emphasis than when they first testified, that the claimant was employed at the instance of the decedent, and that there was a contract between them with regard to the writing and publication of the work in question. But they are no more able to tell the terms of that contract now than they were six months ago, and it is precisely here that the difficulty expressed in the adjudication lay. There is still nothing to show " that the decedent was to pay for and become the proprietor of the work, or that the compensation of the claimant was to be derived from any other source than sales made after the publication." " And claims against the estates of dead men, not asserted while the alleged debtor is living, ought to be supported by the clearest and most convincing evidence. Admissions to third persons are not of this character."

Of course the inferences of the witnesses from the facts to

Adjudication.

which they testify are not to be regarded as evidence; and the letters now produced on behalf of the executors show most conclusively that those inferences were entirely erroneous, according to the claimant's own assertion of the terms of the contract.

The relations of the parties had become unfriendly at least as early as January, 1879. On the 14th of that month, the claimant wrote to the decedent as follows:

"Dear Sir: Will you send me or shall I call for the MS. Independence Hall, I had promised it for to-morrow; the other works you may return at your convenience."

In reply, the decedent on the 17th wrote:

"MR. CHARLES S. KEYSER,

"Dear Sir: I can make no use of the Independence Hall MS. and I am quite willing you shall keep it.

"I will send it to you if you will first return to me the paper slips, letters, &c., which I placed in your possession."

The answer of Mr. Keyser was on the same day:

"MR. HENRY SEYBERT,

"Dear Sir: Under our agreement, I was to furnish the MS. of the work you desired to be prepared on Independence Hall and its clocks and bells, and you were to pay the expense of publication; the profits were to be divided equally after you were first repaid the cost of publication.

"To this agreement I must hold you, unless the work I have done after some months of labor is not such a volume as would meet the approval of the most competent judges. I have agreed with you to submit it to the judgment of Mr. Wallace and Mr. Westcott, or any other gentlemen of like character and reputation. I am still willing to do so, and would be pleased to hear from you at your earliest convenience, if the names of these gentlemen meet your approval."

To this Mr. Seybert, on the next day, wrote as follows:

"DEAR SIR: You are mistaken in your statement of an agreement between us, as put in your letter of 17th January, 1879. No such agreement was ever made. The MS. was written for me for the price of $100, to aid Mr. Crandon's

Adjudication.

enterprise, in which you appeared interested. I paid this and an additional price, not agreed upon, viz., fifty dollars for copying. I never agreed to publish it or any work, unless I should deem it proper to do so after examination.

" The MS. is not, in my judgment, worthy of publication. No possible profit could result therefrom. I am not willing to incur the considerable expense which such publication would .entail."

The following letter from Mr. Keyser closed the correspondence :

" MR. HENRY SEYBERT,

" DEAR SIR : It will effect no result to continue this correspondence.

" I consented to write the work, with a good deal of reluctance and after repeated interviews with you at my office, for publication. The terms of the agreement were subsequently definitely determined between us ; I gave you estimates of the price, to which you did not object; I read you chapters of the MS. which you approved.

" We agreed that the work should be submitted to literary gentlemen for their judgment on its merits, and agreed on their names ; you also desired to read it, lest there might be passages from which the public might infer, as in the case of the bell was inferred by councils, on the first presentation of that object, that it was designed to minister to your personal vanity.

" Beyond this nothing more.

" I never agreed to submit the work to your literary judgment, because, as you very properly said, you had none.

" There is only one way to determine the matter between us, that is, to submit to gentlemen competent to determine, as arbitrators, the facts of the case. Neither of us want the publicity of a trial. I do not suppose you will submit; I certainly will not submit to what seems to me gross wrong done in an insulting manner from any one."

" JANUARY 18th, 1879."

Assuming the agreement to have been as stated in Mr. Keyser's letter of January 17, 1879, he could not, at least without notice to Mr. Seybert and tendering him the manuscript, repudiate it, and sue on the footing of a quantum meruit

Adjudication.

under an employment of his services by the latter; and there was no such notice or tender. But the fact of the agreement was promptly and emphatically denied by Mr. Seybert, who, as far as appears, took no notice of the suggestion in the letter of January 18th, that the question should be referred to competent arbitrators. He lived for more than four years after this, viz., until March 3, 1883. He was possessed of large means, and was abundantly able to respond to any claim that might be recovered against him; but during all this period no steps were taken to establish such claim, and each day, as the recollection of the centennial celebration became dimmed, the value of the work and the chances of deriving profits from its publication grew less and less. The inaction of the claimant while the decedent lived, though it may not now estop him, is cogent evidence of his own belief that his claim was incapable of enforcement. If the arrangement was as alleged by the decedent, the obligation has been fully discharged; if, as asserted by the claimant, the time for publication has been suffered to pass before the completion of the work, the profits would have been nothing and the damage to be recovered, therefore, merely nominal.

It is quite clear, in the light of these letters, that the claim as heretofore presented cannot be allowed, and that the adjudication should not be opened. But Mr. Biddle asked to amend by substituting for the original claim, a claim for damages for breach of the contract asserted in the letter of January 18, 1879. The auditing judge is of opinion, irrespective of the plea of the statute of limitations now set up on behalf of the estate of the decedent, that this cannot be done; nor if done, can it avail the claimant, there being no evidence that profits would have been earned by the publication of the work. The existence of such a contract, which would have been fatal to the claim as asserted in the original demand upon the executors, in the petition upon which the citation for an account was issued, and in its presentation to the auditing judge when the matter first came before him, was wholly ignored and kept out of sight. To suffer it to be set up at this late day could only be done by a total disregard of all principles governing applications for rehearing.

These letters show that the work done by the claimant was

Adjudication

completed at least as early as January, 1879. It is not pretended that the obligation of the decedent arose from any instrument under seal; and, unless something has occurred to relieve the claim from the bar of the statute of limitations, it is clear, whatever may have been its original merits, there can be no recovery at the present time. There is nothing, in the opinion of the auditing judge, which arrests the running of the statute. The decedent lived for over four years after the cause of action arose. About ten months after his death, notice of the claim was given to the executors, who promptly denied any liability and, through their counsel, invited the bringing of a suit at law and offered to accept service of a writ. The course thus suggested was not adopted, the claimant preferring, but without any encouragement or inducement whatever on the part of the executors, or their counsel, to come into the Orphans' Court when an account should be filed. It was said that this was because, as the law was then understood, it was not supposed that the statute of limitations could have any operation. It may be that suitors who, relying upon the doctrine of McClintock's Appeal and the cases which followed it, had forborne to proceed against the estates of decedents, would, after the change announced in Yorks' App., 110 Pa. 69, be afforded a reasonable time, under the principle of Menges v. Dentler, 33 Pa. 495, within which to bring their actions; but Yorks' Appeal was decided January 4, 1886, and the citation, which must be regarded as the bringing of a suit in the Orphans' Court, was not asked for until February 5, 1887, more than a year later. So great a delay, with respect to a claim then over eight years old, as against the estate of a man who had been dead for three years, cannot be considered reasonable.

The claim upon the quantum meruit is, and was at the time of the presentation of the petition for citation, barred by the statute. As proposed to be amended it is also barred, and for this reason, if for no other, the amendment cannot be allowed. See Wood v. Anderson, 25 Pa. 407; Smith v. Smith, 45 Pa. 403.

And now, the claim of Charles S. Keyser having been reconsidered on the petition for rehearing and the evidence offered in support of and against the application, it is ordered and adjudged that the claim be disallowed, the original adjudication

confirmed and the order suspending confirmation rescinded; exceptions to the adjudication and to this order to be filed on or before January 6, 1888.

Within the time limited, the claimant filed various exceptions alleging error in the findings of fact, that the contract claimed upon had not been established by the evidence, and that "there is nothing to show that the decedent was to pay for and become the proprietor of the work, or that the compensation of the claimant was to be derived from any other source than sales made after publication;" and in the conclusion of law that the claim was barred by the statute of limitations.

Said exceptions having been argued before the court in banc, a decree was made dismissing the exceptions and confirming the adjudication. Thereupon the claimant took this appeal, assigning, specifically, the said decree as error.

*Mr. Geo. W. Biddle* (with him *Mr. John A. Clark*), for the appellant:

1. The evidence establishes that there was a contract created by the employment of the claimant by the decedent, that the latter should pay what the services performed by him were reasonably worth. There were no terms named, it is true. None were necessary. Employment and performance raise the implied promise to pay: Roberts v. Swift, 1 Y. 209; Planche v. Colburn, 8 Bing. 14 (21 E. C. L. R. 203). No suit was begun in Seybert's lifetime and none was necessary.

2. If for any cause, proof of a special contract fails or is denied, or if the plaintiff has performed work outside of or beyond the special contract, a recovery may be had upon a quantum meruit outside of the contract altogether, and compensation is to be estimated (the special contract being silent on this subject or failing altogether), at what the services in any case are reasonably worth: Planche v. Colburn, 8 Bing. 14 (21 E. C. L. R. 203); Dermot v. Jones, 23 How. 220; Dermot v. Jones, 2 Wall. 1, 9; Manufacturing Co. v. United States, 17 Wall. 592; Adams v. Crosby, 48 Ind. 153; Shilling v. Templeton, 66 Ind. 587.

3. The auditing judge erred in his view of the statute of

limitations. In the presentation of a claim in the Orphans' Court, as no writ can issue, it is only necessary, in order to toll the statute, to make a formal demand of the executor or administrator. Any other course would be fraught with inconvenience and possible disaster. Suppose a claim more than five years old when the decedent died. Must the creditor run the risk of losing his claim by waiting until the audit of the account, or ask for a citation to stimulate neglectful action? The law requires neither. In Yorks' App., 110 Pa. 74–76, PAXSON, J., says: " This claim was *not presented* until nearly seven years after the letters testamentary were taken out. . . . . . But how are we to say that this debt, which was not *presented to the executors* within twelve years after it had matured, etc. . . . . As suits are not brought upon claims in the Orphans' Court, the presentation of the demand to the executor or administrator may be regarded as its equivalent, so far as regards the status of the claim."

*Mr. John G. Johnson* (with him *Mr. William B. Robins*), for the appellees:

Argued from the evidence : 1. There was no original contract to pay a quantum meruit for the preparation of the manuscript. 2. There was no proof of the alleged contract to publish and to divide the profits. 3. There was no proof of the amount of damages occasioned by the breach of this last alleged contract. 4. The statute of limitations barred the claim, citing: Yorks' App., 110 Pa. at p. 83.

OPINION, MR. CHIEF JUSTICE PAXSON:

In the court below the appellant presented a claim of three thousand dollars against the estate of Henry Seybert, deceased, for literary services performed by him for the decedent in his lifetime, in preparing a work entitled, The Chronicles of Independence Hall. That the work was performed, and that it was worth the sum demanded was not seriously controverted. The difficulty in the case lies deeper.

The appellant sought to recover as upon a quantum meruit, by showing that he was engaged by the testator to perform the service and the value of it. The court below, however, has distinctly found that the relation of the parties was not that of

employer and employee; that there was no contract by which the decedent was to pay for and become the proprietor of the work, but that on the contrary, the appellant's compensation was to be derived solely from the profits arising from sales thereof after publication. We will not review the evidence in detail by which this result was reached. We must accept the findings of the court upon questions of fact, as we have repeatedly said, unless error is clearly made to appear. This has not been done, nor do I see how it could have been in view of appellant's statement of the contract as contained in his letter to Mr. Seybert of January 17, 1879. The letter was as follows:

" Mr. HENRY SEYBERT :

" Dear Sir : Under our agreement, I was to furnish the MS. of the work you desired to be prepared on Independence Hall, and its clocks and bells, and you were to pay the expense of publication; the profits were to be divided equally after you were first repaid the cost of publication.

" To this agreement I must hold you, unless the work I have done after some months of labor is not such a volume as would meet the approval of the most competent judges. I have agreed with you to submit it to the judgment of Mr. Wallace and Mr. Westcott, or any other gentlemen of like character and reputation. I am still willing to do so, and would be pleased to hear from you at your earliest convenience, if the names of these gentlemen meet your approval."

This is an entirely different contract from the one set up in the Orphans' Court, and precludes a recovery upon a quantum meruit. An action would indeed lie upon the contract proved, but its breach would be the refusal of the decedent to publish the book. A claim for this breach might have been made in the Orphans' Court, but it was not, nor was there any evidence by which the damages could have been measured. Speaking for myself, I do not see why a work upon such a subject, written by a gentleman of the appellant's known literary ability, should not prove of general interest and command a ready sale, if too much prominence is not given to the decedent and his bells.

We might well stop here. There is, however, another difficulty, equally serious, in the way of the appellant. The appel-

lees set up the statute of limitations. Much more than six years had elapsed from the completion of the work and the presentation of the claim in the Orphans' Court. Mr. Seybert flatly repudiated it in 1879. Thus the matter rested until his death in 1883. After that event a demand was made in writing on his executors for the payment of the sum of $3,000 as compensation for writing the book. This was on January 17, 1884. The executors refused to recognize the claim, and offered to accept service of a writ. Nothing further was done until the citation was asked for in 1887, after which the claim was presented to the Orphans' Court for adjudication. It will thus be seen that for at least eight years the claim was ripe for suit and was all that time repudiated. The statute commenced to run not later than 1879. It was not stopped by the death of the decedent as all the authorities show. Was it stopped by the demand upon the executors in 1884, a demand not recognized by them and not followed up by any aggressive measure until 1887? It is not pretended that a mere demand upon Mr. Seybert in his lifetime would toll the statute. Was a demand upon his executors after his death of any greater effect? If so, it is an anomaly.

It was urged that Yorks' App., 110 Pa. 69, sustains the contention of the appellant in this respect, and that a mere demand upon the executor tolls the statute. If this be so Yorks' Appeal needs amendment.

I concede that the language cited by appellant is to be found in the first opinion in Yorks' Appeal at page 76. But the first opinion is not Yorks' Appeal, it is only a part; and the least important part of it. In the first we tried to avoid overruling McClintock's Appeal, and the line of cases following it. Speaking for myself, I felt averse to reversing the opinion of so eminent a jurist as the late Chief Justice BLACK. It was this feeling which prevented our going as far in the first decision as we felt the law would justify. Subsequent reflection satisfied us that it was a mistake to temporize, and we applied the knife. We intended to cut this judicial excrescence out of our system of law, and we are not convinced that we did not succeed. The language quoted by the appellant from the first opinion is as much overruled by the second as was McClintock's Appeal itself, and the broad principle was distinctly

asserted that the statute of limitations may be set up in the Orphans' Court precisely as in a court of law. Nor can the statute be tolled by anything short of a suit at law or what is its equivalent in the Orphans' Court. A mere demand upon an executor is not such equivalent and it does not toll the statute. This is as plain as I can make it.

I desire further to say that there was no question in Yorks' Appeal of the presentation of the claim to the executors. No such presentation had been made. The language quoted in the opinion was stated argumentatively, and was mere dictum, for which I am alone responsible. It was not the point decided in the case.

Subsequent reflection has convinced us that Yorks' Appeal was well decided. The court as now constituted are united in sustaining it.

Upon either of the grounds indicated the appellant has no case.

> The decree is affirmed, and the appeal dismissed at the costs of the appellant.