## Stevenson's Estate.

*Marriage—Proof of—Cohabitation and reputation—Illicit inter-course—Presumption—Claim of alleged widow of decedent—Husband and wife—Decedents' estates—Evidence—Findings of fact—Orphans' court—Appeal.*

1. A finding by the orphans' court that a marriage did not in fact exist between decedent and a woman claiming to be his widow, when based upon sufficient and competent evidence, will not be reversed on appeal, in the absence of manifest error or mistake.

2. When it is attempted to establish marriage without the usual formalities, the courts will examine with great scrutiny an alleged oral marital contract and the conduct of the parties in relation to each other before and after such contract.

3. Where there has been an admitted illicit course of conduct for many years between a decedent and a woman claiming to be his widow, and the woman alleges a marital contract by words spoken by decedent, marriage will not be presumed because of cohabitation and reputation without proof of a changed relation.

4. Marriage is a civil contract by which a man and woman agree to take each other for husband and wife during their joint lives, unless it is annulled by law. Each must be capable of assenting, and must in fact consent to form this new relation.

5. Where an undoubted marriage in some form exists, the courts will hesitate to strike it down; but when the lips of a man are sealed by death, and he leaves no satisfactory evidence as to the existence of such contract, they will be slow to establish it in derogation of the undoubted rights of those who follow him.

Argued October 12, 1921. Appeal, No. 113, Oct. T., 1921, by Nannie G. Stevenson, claiming as widow, from decree of O. C. Allegheny Co., Sept. T., 1920, No. 563, dismissing exceptions to adjudication, in estate of Archibald M. Stevenson, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Exceptions to adjudication. Before MITCHELL, J.

The opinion of the Supreme Court states the facts.

Exceptions dismissed. Nannie G. Stevenson, claiming as widow, appealed.

*Error assigned,* inter alia, was decree, quoting it.

*James L. Weldon,* with him *H. G. Bye, John C. Sherriff* and *Alexander P. Lindsay,* for appellant.—The presumption of the continuation of an illicit relation under the circumstances gives way to the superior presumption, the favorable compliance with the requirements of the law of marriage and common decency: Knecht v. Knecht, 261 Pa. 410; Thewlis's Est., 217 Pa. 307; Kustus v. Hager, 269 Pa. 103; Beale v. Kline, 183 Pa. 149.

All presumptions favor marriage and every bona fide attempt to effect it, and courts are extremely reluctant and rightly so to declare a marriage void except for the strongest and most obvious reason: Phillips v. Gregg, 10 Watts 158.

*M. W. Acheson, Jr.,* of *Sterrett & Acheson,* with him *Joseph J. Goldsmith* and *John C. Bane,* for appellees.— There was no such cohabitation and reputation or other evidence as to justify an inference of marriage: Bicking's App., 2 Brewster 202; Drinkhouse's Est., 151 Pa. 294; Yardley's Est., 75 Pa. 207.

When the relation between a man and a woman living together is illicit in its commencement it is presumed so to continue until a changed relation is proved: Patterson's Est., 237 Pa. 24; Reading F. Ins. & T. Co.'s App., 113 Pa. 204; Keyser's App., 124 Pa. 80; Comly's Est., 185 Pa. 208.

All claimant offers is her unsupported, interested testimony of the man's unoverheard supposed admissions, something to be received with caution and scrutiny: Shuman's Est., 45 Pa. Superior Ct. 587, 592.

The alleged Knoxville conversation, even if found, and even if treated as marital, does not establish a contract of marriage: Hantz v. Sealy, 6 Binney 405; Com. v. Stump, 53 Pa. 132; Tholey's App., 93 Pa. 36; Reading F. Ins. & T. Co.'s App., 113 Pa. 204; Knecht v. Knecht, 261 Pa. 410.

OPINION BY MR. JUSTICE KEPHART, January 3, 1922:

Appellant, Nannie G. Bradley, in 1904, at the age of twenty-five, while employed as a milliner, met Archibald M. Stevenson, the decedent, in Pittsburgh. Thereafter, as she continued in this and other similar positions, the acquaintance ripened into an attachment, followed by a more intimate relation; how soon this occurred after their first meeting does not appear; it was left open to an inference that it was shortly afterwards, and continued until she went to Youngstown, Ohio, and thereafter. Frequent jaunts from Youngstown were taken by them, some quite lengthy, and, as it was inconvenient under such circumstances to travel on a boat or live at hotels as unmarried persons, they registered as man and wife; during these times, when necessity demanded, because a curious situation would be otherwise presented, Stevenson introduced claimant as Mrs. Stevenson. Business and no doubt pleasure required her repeated journeys to Pittsburgh, on such occasions very often staying over night with Stevenson at various hotels, of course as his wife. In 1911 Miss Bradley engaged in millinery business at Youngstown. This was arranged by Stevenson paying a large part if not all of the cost, and keeping the claimant supplied with money at all times while conducting this business.

Whatever may have been the real purpose of the establishment in Ohio, decedent's mother, to whom he was apparently devoted, and to whom he would in time owe much, was living, and his duty, to the point of not marrying, was, as he said, to her; and it may also be inferred he did not want her to know of his unbecoming conduct, which might prove disastrous. Whether the Ohio arrangement was for claimant's benefit or to screen his acts, he knew where Miss Bradley was located at all times, visiting there nearly every Sunday. He presented her with jewelry, money in large sums and valuable shares of stock.

Early in 1918, a Miss Wise, living in Youngstown, was arranging for her coming marriage to a soldier in camp at Asheville, N. C. The date for the wedding was fixed for the 21st of March. Claimant and Miss Wise were friends. Claimant had inserted an item in the society column of a Youngstown newspaper to the effect that she was to be married to Stevenson March 20th, and, after a trip to Florida and other southern points, they would reside in Pittsburgh. Stevenson did not appear in Youngstown on the day set for the wedding, notwithstanding the fact that the distance is very short. He gave as an excuse, according to Miss Bradley, that he was securing a loan from a bank in Tarentum, but was disappointed, and would have to apply to a Pittsburgh bank. Banking hours close at three o'clock, and Youngstown is within an hour or so's ride from Pittsburgh; on the day fixed for the wedding, Miss Bradley came to Pittsburgh and left in company with Miss Wise for Asheville, with the understanding that Stevenson was to follow. Miss Wise's wedding occurred on the 21st of March, and Stevenson joined Miss Bradley at Greenville, N. C., on the 28th. They remained at this place a few days, and went thence to Knoxville, Tennessee. There appellant insisted on marriage. The excuse for delay had disappeared; his mother had been dead for five years and the engagement was now nearly fourteen years old. He was then informed the trip would end unless they were married. This conversation occurred, which claimant states is a contract of marriage: "I told Arch we would discontinue our trip unless we were married, I could not go any further on the trip, and Arch came across the room, took me in his arms, saying, 'Nancie, as long as you live I would not give you up, I will not give you up as long as I live; ......from to-night on I am going to give you my name and protect you; ......you are my wife, I always considered you for years as such; ......from to-night on we are married,......I will give you my name and pro-

tect you as long as I live.  Now,......we are as near and dear to each other as it is possible for us to be, from now on you are Mrs. Stevenson,' and I was satisfied.  Q. Did you agree to that?  A.  I did."

They continued the journey, living at hotels as man and wife, later returning to Pittsburgh.  Claimant, in April, moved her furniture from Youngstown into an apartment house at Beechview, Pittsburgh; here Stevenson paid the house bills, including rent.  The parties were not introduced as husband and wife, except by relatives of claimant.  She was known to tradespeople in that vicinity as his wife, but not to the people generally or any part of them, save as indicated.  She had few guests except relatives; to these few she was known as Mrs. Stevenson.  Later, when visiting Youngstown or her uncle, she was addressed by letter as Mrs. A. M. Stevenson.  The reason for this is obvious,—it enabled them to continue the deception.

Decedent never introduced her as his wife, nor was there an announcement, oral or written, of the fact of marriage.  While an apartment was maintained at Beechview, many miles from deceased's usual place of abode or where his friends and acquaintances lived, Stevenson kept another woman in a different part of the city.  Appellant knew of this, and would accompany him to her house, remaining outside or at some theater until his visit with the other woman was over.  He maintained a residence on Negley Avenue, where his clothing was kept; in this district he also voted.  Claimant let rooms in the apartment to others, and, after Stevenson would leave in the evening, she was known to go out and not return until late at night or possibly the next morning.

Stevenson died February 1, 1920, intestate, possessed of a considerable estate, consisting of real and personal property.  His immediate blood relatives were a brother and sister.  Appellant petitioned for the allowance of $5,000 as the widow of decedent, and the court below, after full hearing, denied the petition, holding claimant

was not his wife but his kept mistress. The present appeal challenges the correctness of this finding.

While it is our duty to examine all the testimony, the court below heard the witnesses, and could best judge of their credibility; after a careful consideration and due credit given the evidence of claimant, we are now asked to declare his finding error. It certainly was not a misconception of the law as applicable to the facts, as will appear later. If it was a mistake in a deduction of fact, the burden is on appellant to point it out clearly. It is not enough to demonstrate the fact found is doubtful, or that the finding appears to be against the weight of the testimony. Nor will it avail that we might have reached a different decision had the question been for us in the first instance; we are not in a position to judge the credibility of the witnesses. Their finding of fact must stand unless manifest error or mistake clearly appears: see Comly's Est., 185 Pa. 208, 216; Patterson's Est., 237 Pa. 24, 27; Keyser's App., 124 Pa. 80, 90. We have carefully examined all the evidence, as did the court below, and we do not find sufficient upon which to predicate reversible error.

Counsel for appellee well states: "Marriage exists not only for the happiness of the parties, but for the welfare of society. It is the most important engagement that man and woman can enter into. It is the basis of civilized society, of the home, of the family, of sound morals, and of the domestic affection." When it is attempted to establish marriage without the usual formalities, we should examine the professed contract with great scrutiny, and be entirely satisfied this solemn undertaking has been entered into by the voluntary assent of both parties.

The mere fact decedent joined, ostensibly as husband of appellant, in the conveyance of a few lots in Youngstown, Ohio, where she had lived for some years prior to moving to Pittsburgh, is not conclusive on the question of marriage, nor would the additional facts in evidence

work such results. The assertion in the newspaper, published in Youngstown, that she was to be married to Stevenson in the south, together with the reported statement the marriage had been consummated, with the same idea prevailing in the scrivener's mind, would no doubt make sale of the lots difficult; to facilitate sales, and to satisfy the purchaser, removing all doubt as to title, it can readily be seen why Stevenson joined in the deed as though her husband: Reading Fire Insurance & Trust Company's App., 113 Pa. 204, 206; Divver's Est., 22 Pa. Superior Ct. 436, 444; Chamberlain v. Chamberlain, 71 N. Y. 423, 426.

This act, like many others before and after the supposed marriage, was done for the purpose of deceiving the public and making their continued illegal relations easier. The same may be said with regard to the circumstances attending leasing the apartment at a place remote from decedent's Negley Street residence, and all dealings with tradespeople in that vicinity. In line with this, may be considered their infrequent social intercourse with claimant's relatives.

Appellant complains the learned judge of the court below laid too much stress on the illicit relation existing prior to the trip south. She voluntarily testified to these occurrences. Our Brother SIMPSON, in Kustus v. Hager, 269 Pa. 103, 108, says: "we must be careful to give to it [the meretricious relation] only the weight which properly flows therefrom," holding that, standing alone, it was insufficient proof of undue influence, but where, as here, we have an admitted illicit course of conduct for many years before the alleged marital contract, marriage will not be presumed because of cohabitation and reputation without proof of a changed relation: Yardley's Est., 75 Pa. 207, 211; Patterson's Est., 237 Pa. 24, 28; Hunt's App., 86 Pa. 294, 297; Grimm's Est., 131 Pa. 199, 202. The evidence of such cohabitation and reputation, as found by the court below, was not sufficient on which to imply marriage. The learned judge

states: "There is nothing prior to April, 1918, relied upon by the claimant to establish her claim of marriage. There is testimony of an engagement......but it is a fair inference......decedent was not eager to enter into the contract. He is evasive to those who mention the matter to him; there is no......evidence he ever introduced the subject of his marriage to anyone. When asked by the claimant's niece when he was going to be married he answered, 'Some of these days.' Mr. Ruth, who was a willing witness, did not ascertain from the decedent anything definite as to when the marriage might be expected. The letters from decedent to claimant make no mention of an intended marriage. It is noticeable that in the letters introduced from decedent to claimant, bearing dates subsequent to April, 1918, no reference is made to the marriage, nor is there anything to indicate a new relationship. The terms 'husband' and 'wife' are not found in these letters. The claimant seems to have been anxious for the marriage, and indeed she should have been. She had the announcement of her approaching marriage made in the newspapers, but even this did not bring a ceremony. The decedent made excuses for not observing this most important date,—his wedding day,—because of an application for a loan in a bank. With the day of the advertised marriage at hand, something must be done; she goes south and the decedent follows. They resume their meretricious relations, and, on her threatening to discontinue the trip unless a marriage is performed, the scene in the Knoxville Hotel is said to have been enacted......The Beechview house is rented and the furniture moved in; the decedent does not provide the furnishment; all that goes into the house to equip it is the furniture of the claimant. She is established in the house; he pays the rent, supplies the living and meets all the expenses. The decedent was there much and was seen morning and evening going and coming, according to some neighbors. Here she was installed, in a part of the city known as the South Hills

district, five miles away, and in quite another direction from the Stevenson Homestead; it was reached by different car lines, and there would be small chance of the decedent's family and friends being frequently in that neighborhood......The decedent did not introduce or speak of claimant as his wife excepting to merchants and a few neighbors around the Beechview home. This was necessary, for how could they live in a respectable community unless they passed among the people there as husband and wife? There was no recognition nor even knowledge of a marriage among the friends of the decedent. The visitors to the Beechview house were the friends and relatives of the claimant, and they were the ones to whom the representation of marriage was made. After April, 1918, the decedent did address letters to claimant as Mrs. Stevenson, but these letters were sent to her when she was in Youngstown, where her friends supposed her to be married. Similarly addressed letters were written by him to her when she was visiting in the home of her uncle......As Justice SHARSWOOD said in Bicking's App., 2 Brewster 202, 'A man may live with his kept mistress in such a way as to create a kind of repute of marriage among some persons; he may even, to gratify her, allow himself to be held out, or hold himself out, to her friends and acquaintances, as her husband, may be a constant visitor, sleep and often eat at her house, may recognize the fruit of the connection as his children, and manifest affection and tenderness toward them; yet the evidence may fall far short of that which ought to satisfy the mind that there was an actual agreement to form the lawful relation of husband and wife. The conduct of the parties must be such that almost anyone acquainted with them would naturally infer that they bore that relation to each other.' "

We cannot view what the decedent said on the trip south as being sufficient on which to ground a contract of marriage. When we consider his acts, his failure to appear, the age of the claimant and her knowledge of what

is necessary to constitute marriage, the avowed purpose of the trip as she describes it, the relationship of the parties for many years before, and, further, the time, place and circumstances under which the language was used, his conduct appears to us in no other light than a reassertion of his protestations written so many times in letters before the trip took place. To this scene must be applied not only knowledge of the precedent facts, but ordinary common sense; and it is useless to discuss it further. It is not the case of a young inexperienced girl, but a woman of mature years, with a knowledge of the world. Moreover, the only evidence as to what took place came from the lips of the claimant, a very much interested party, and must be received with caution and scrutiny. The court below found appellant not to be decedent's wife. He had before him a plain contradiction of the Knoxville statement in the evidence of Ritzi, the druggist, who testified that, after the return from the southern trip, appellant said she was going to Pittsburgh to be married to Mr. Stevenson, and her subsequent introduction in a garage by her maiden name. But it is more than doubtful if the words used rose to the dignity of a contract "to be performed either in Ohio or Pennsylvania." "Marriage is a civil contract by which a man and woman agree to take each other for husband and wife during their joint lives, unless it is annulled by law, and to discharge toward each other the duties imposed by law upon such relation. Each must be capable of assenting and must in fact consent to form this new relation": Topper v. Perry, 197 Mo. 531, 546. We need not rest our decision on the inadequacy of the words, for the contradictions noted would be sufficient to sustain the finding of the court below.

Appellant is wrong in applying the rules of law as to all presumptions being in favor of the marriage contract. It is quite true where an undoubted marriage exists in some form, courts, for obvious reasons, should hesitate to strike it down. The security of homes as well as the

paternity of children is at stake. But it is equally true that, when the lips of a man are sealed by death, and he leaves no satisfactory evidence as to the existence of such contract, courts will be very slow to establish it in derogation of the undoubted rights of those who follow him. Decedent's conduct may have been the subject of severe censure, as his acts offended all moral laws. Indeed it might have gone still further,—had children been brought into the world,—that, however, is not in this case. But a marriage cannot be presumed from such acts, for to do so would place a premium on illicit relationship. Claimant, better than anyone else, knew her exact standing with Stevenson. She knew she was not accorded the rights of a wife or anything that resembled them. She likewise knew the reason. Those who, with a clear understanding of what the laws require, embark in undertakings such as those found by the court below, must abide by the consequences of their acts. The court will not relieve them unless it plainly appears there was an actual agreement to form the legal relation of husband and wife.

The decree of the court below is affirmed.