## Heckman et al. v. Nye et al.

*John A. Moss* and *Wilson S. Rothermel,* for plaintiffs.
*Paul D. Edelman,* for defendants.

SHANAMAN, J., July 3, 1930.—

*Pleadings and issue.*

Plaintiffs filed a bill in equity praying that it be decreed that plaintiffs own certain land, that defendants be restrained from conveying and encumbering plaintiffs' estate therein, that a certain mortgage of plaintiffs' interest, executed by defendants Roat to defendant Brumbach, be declared of no effect as to plaintiffs' interest, and that defendant Nye pay into court certain moneys received for the sale of plaintiffs' alleged interest. Plaintiffs joined the vendor, the vendees and the mortgage holder as defendants. Nye, the vendor, and Brumbach, the mortgage holder, neither appeared nor answered. The vendees answered, setting up title through defendant Nye, the vendor.

The questions at issue are:

1. Whether or not Nye was a tenant by entireties and was, therefore, successor in title to his deceased wife Carrie, the controlling matter of fact in this regard being whether or not Clayton P. Nye and Carrie Heckman (Nye) were husband and wife at the time they received title to the property in question; and

2. If not husband and wife, are Nye's deed and his vendees' mortgage good against the plaintiffs, who are heirs of Carrie Heckman, by estoppel or other rule of law?

*Findings of fact.*

1. Carrie Heckman was divorced by her husband, Thomas Heckman, on November 1, 1920. For some years prior to her divorce she had meretricious relations with one Clayton P. Nye. At the time of her divorce she was living apart from her husband and was dwelling and cohabiting with said Nye. After the divorce from Heckman she lived for some months with her daughter and for some months with Nye.

2. On July 26, 1921, Samuel F. Fisher and Ada J. Fisher conveyed, by deed duly recorded, the premises No. 1657 North Ninth Street, Reading, Pennsylvania, to Clayton P. Nye and Carrie A. Nye, his wife. Thence and thereafter the pair resided and cohabited sexually in the said house until the death of Carrie A. Nye on November 8, 1927.

3. At the time of the conveyance to Nye and Carrie A. Nye, his wife, the couple executed on the same day a bond to John N. Leedom for $2200, in which the obligors were stated to be Clayton P. Nye and Carrie A. Nye, his wife. On the same day they executed and delivered to Leedom a mortgage securing payment of said bond upon the said property. In said mortgage the mortgagors were stated to be Clayton P. Nye and Carrie A. Nye, his wife. Furthermore, they introduced themselves as husband and wife to the notary public, who did not know them to be otherwise, but took their acknowledgments as such. The mortgage was recorded *eo die.*

4. During the years 1922 to 1927, school and city taxes were billed in the names of Nye and wife, and the woman's personal tax of 30 cents in each year was assessed to Mrs. Carrie Nye. Interest on the mortgage was annually billed to Clayton and Carrie A. Nye. Bills for electric wiring and house painting were billed by tradesmen to Clayton and Carrie Nye and to Clayton P. Nye and wife. Mail matter was addressed to Mrs. Carrie Nye. We might perhaps take judicial notice that the local directory, in the years 1923, 1924, 1925 and 1927, contained the following line: "Nye, Clayton P. (Carrie A.) laborer, 1657 North 9th." However, such fact in no way influences the decision at which we shall arrive.

5. On one occasion, when a stranger asked the next-door neighbor of the Nyes whether she knew Clayton Nye, Mrs. Nye, who happened to overhear the question, said, "That's my husband." The decedent once said to one of the plaintiffs that she would never marry Nye, that he was no good, but that she would battle it out with him to the end and for her own protection would not leave him. When Nye sent flowers to decedent's funeral, he told the florist to mark them "From a Friend," and the saleslady wrote on the card, at his direction, "From a Friend, Clayton Nye." At the funeral Nye said he was ashamed because all the relatives were there and he wasn't related. When, preparatory to the funeral, Reverend Brownmiller called at the house, Nye received him and told him his wife had died. Brownmiller then started to write the obituary and wrote "Carrie, wife of Clayton Nye." He then read it to Nye and the children, and the children stopped him and said it wasn't correct, whereupon Nye said he wasn't certain who married them, and Brownmiller said he would omit reference to that, to which Nye rejoined that he thought that would be the better plan.

6. Mrs. Trostle, the next-door neighbor, recollected that the neighbors spoke of decedent sometimes as Mrs. Nye and sometimes as Mrs. Heckman. Weisser, interested in the purchase, testified that the neighbors called her Carrie Nye. Mrs. Weisser, who lived next door to the Nyes during the spring and summer of 1921, knew her as Mrs. Nye. Nye upon one occasion said: "We [meaning himself and Carrie Heckman] are just like man and wife."

7. Mrs. Phillips, a neighbor, knew decedent as, and only as, Carrie Heckman up to the time of her death. She was of opinion that most neighbors called the decedent Mrs. Heckman. She testified that the decedent upon one occasion said that she was mistreated by Nye, but could not arrest him as they were not married. About two years before decedent's death, Nye told the witness that he was single and free to go with another woman.

8. Mrs. Daisy Crouse testified that about two years before decedent's death decedent denied she was married to Nye, and said that Nye was so ugly to her that she would never marry him.

9. Mrs. Emma Watson, a neighbor living a block away from them, knew both Nye and decedent, and always heard decedent referred to as Mrs. Heckman.

10. Philip Quell, a neighbor, heard of the decedent always and only as Mrs. Heckman, and questioned her once, and she replied that she wasn't married. When she would sometimes say that she would never marry Nye, Nye, in the witness's presence, merely laughed.

11. William Hoffert, a neighbor, is a butcher and grocer who sold articles to the decedent. He knew her as Mrs. Heckman. This name she gave when she asked for credit.

12. The couple were at no time generally reputed to be married.

13. Clayton P. Nye and Carrie Heckman never were married, either by ceremony or at common law.

14. Clayton P. Nye and Carrie Heckman never were tenants by entireties of property No. 1657 North Ninth Street, Reading, Pennsylvania.

15. By deed dated December 12, 1928, duly recorded, Clayton P. Nye conveyed to the defendants, Luther E. Roat and Mamie E. Roat, his wife, the property in question. The deed states a consideration of $3000. The real consideration was $2500. The deed recites the death of Carrie A. Nye, wife of the grantor.

16. By indenture dated December 12, 1928, duly recorded, defendants Luther E. Roat and Mamie E. Roat, his wife, mortgaged the said premises to defendant William Murray Brumbach for $1900.

17. The vendee, Roat, had actual notice that Nye's marriage had not been ceremonially solemnized by any officer or minister authorized to marry, and that it existed, if at all, at common law.

18. The vendees, Roat and wife, had no actual notice, at or prior to their consummating the purchase from Nye, that any one disputed the validity of his marriage at common law to Mrs. Nye, or his power to make good and effectual deed of the fee.

19. It is neither averred nor testified that the mortgagee, Brumbach, had actual notice, direct or indirect, that the marriage between Nye and Mrs. Heckman had not been performed by a clergyman or duly authorized official, or that any one disputed Nye's marriage to Mrs. Nye, or Nye's power to make good and effectual deed of the fee.

20. No will or last testament of Carrie Heckman has been proved or offered, and the case was tried and argued upon the assumption by counsel for both sides that Carrie Heckman died intestate.

21. The fair market value of the property on December 12, 1928, was $2500. The net proceeds of its sale were $1835.52.

### Discussion.

The couple's relations were illicit in origin. After Carrie Heckman was divorced, she continued to cohabit with Nye. The natural presumption is that their relations continued to be illicit. The general presumption in favor of innocence, and therefore of valid marriage, does not apply to a couple who by their very misconduct have proved that they cannot be presumed to act innocently and lawfully. Of course, it was open to the pair to legitimate their relation, either by a ceremonial or by a common-law marriage. It is contended, not that there was a ceremonial, but that there was a common-law marriage. The standard proof is laid down in McDevitt's Estate, 280 Pa. 50, 52: "The change may be established by circumstantial evidence, but the circumstances must be such as to exclude the presumption that the original relation continued, and to prove satisfactorily that it was changed to matrimonial union by mutual consent." The findings of fact three to eleven, inclusive, and fifteen, furnish only conflicting statements and admissions by language and conduct of the parties as to whether they regarded themselves as married. There is at least as much in that evidence that they did not regard themselves as married as that they did. The evidence falls far short of excluding the presumption of continued meretricious relation, and does not in any sense prove satisfactorily that such relation was changed to matrimonial union by mutual consent.

The mortgage and bond executed by the pair as husband and wife, when they introduced themselves as such to the notary, and the deed to the Roats executed by Nye as survivor, are, it is true, solemn acts. They are, however, outweighed by the opposing evidence. The statement of the lower court, in Thewlis's Estate, 217 Pa. 307, that "in the face of this deed a finding that there was then no valid marriage would be impossible," must be limited to the facts of that case by virtue of the decisions in Appeal of The Reading Fire Insurance and Trust Company, 113 Pa. 204, Stevenson's Estate, 272 Pa. 291, McDevitt's Estate, 280 Pa. 50, and Divvers's Estate, 22 Pa. Superior Ct. 436. In each of the last-named cases, the fact that the pair joined as man and wife in a solemn deed did not establish their marriage. Such joint conveyances are merely circumstances from which, in combination with other facts, different inferences may be drawn in different cases.

Counsel also urge that general repute may be considered in establishing a marriage. Cohabitation, plus reputation, are circumstances from which a marriage may be presumed: McDevitt's Estate, *supra*. Such presumptions may, however, be rebutted: *Id.* In the present case, the testimony leaves it quite patent that the couple enjoyed no general reputation of being man and wife, and even if such reputation had existed, there is considerable testimony to rebut the presumption of marriage. We conclude that the couple were not husband and wife, and, therefore, were not tenants by the entireties of the property in question. They were, in fact, tenants in common. If, as in Morris *v.* McCarty (Mass), 32 N. E. 938, the deed had called expressly for a tenancy by entireties and positively not in common, we could rule that it created a joint tenancy, though not a tenancy by entireties. Even in such case, however, our own century-old statute, depriving joint estates of survivorship, would mould the estate in effect to a tenancy in common. If it was a tenancy in common, plaintiffs, as heirs of their mother, are the owners of an undivided moiety of the property, and the deed to the Roats and the mortgage by the Roats to Brumbach, purporting to convey and encumber their interest, were ineffectual so to do, in the absence of any estoppel or rule of law which would prevent the present plaintiffs from denying Clayton Nye's title as against his vendees.

After careful consideration, we are inclined to the opinion that under all the circumstances of this case the plaintiffs must have their remedy against Nye and cannot have it against the Roats, as vendees, nor against Brumbach, the subsequent mortgagee. Carrie Heckman was never the wife of Clayton Nye. He was never her husband. Their cohabitation from beginning to end was illicit. When they purchased the premises in question they introduced themselves to the notary public and to his father, one of the vendors, as husband and wife. They were not known to be otherwise, and the deed, purchase money bond and accompanying mortgage were drawn to and from them as husband and wife. Their acknowledgments were so taken, and the papers so executed by them. Furthermore, for them and at their request, their deed was on the same day recorded. During the following year the supposed Mrs. Nye called monthly at Mr. Fisher's office to make payments on the second mortgage. During all this time and for several years thereafter Mr. Fisher thought that she was a married woman, wife of Clayton Nye. The supposed Mrs. Nye's conduct, therefore, amounted to this: not being married, and actually being the owner in common of an undivided moiety of the property, by virtue of articles of agreement, or, if there were no articles, then being about to become such owner by conveyance of the title from the Fishers, she, nevertheless, in substance, said to the vendors and the notary public: "Mr. Nye and I, the purchasers, are married. We are taking title in both names for the purpose of affecting the title and the record thereof. We desire that our deed be made to us as husband and wife, and, so made, be placed on record, and we are executing two necessary mortgages as husband and wife, and have acknowledged them that they may be recorded. We desire and expect that future purchasers and encumbrancers will, may, and must to some extent be affected by implied knowledge of the title status which we are hereby creating. That status will naturally appear to them to be by tenancy by the entireties, involving all the legal incidents thereof." The supposed Mrs. Nye actively held herself and Nye out to future purchasers and encumbrancers as husband and wife and as tenants by the entireties. In so doing, she grossly misrepresented the title. She did all the things which the plaintiffs in Fairchild *v.* Dunbar Furnace Co., 128 Pa. 485, did not do. In that case they were

not held as estopped, the court saying, at page 499: "It is not pretended that the plaintiffs who were entitled in remainder allowed their father to hold himself out to the world as the owner, or that they misrepresented the title; that they stood by and encouraged the execution of the contract, or that they ever knew such a transaction was on foot. Indeed, it is not even alleged that they did anything which amounted to the suggestion of a falsehood; that they concealed their rights or suppressed the truth; that they were silent when they should have spoken, or that anything that they did influenced the conduct of the defendant, or misled them in any way to their injury." By her misconduct, Mrs. Nye created an equitable estoppel against herself to deny the title which she ostensibly created if an innocent purchaser or encumbrancer for value, without actual notice of the truth, relied thereon.

This identical principle was applied in the case of Willis v. Lockett, 26 S. W. 419 (Texas). In that case W. B. Bailey conducted business under the firm name of W. B. Bailey & Son. He accepted a deed in the name of W. B. Bailey & Son, grantees, the deed reciting that W. B. Bailey and W. W. Bailey were copartners. He subsequently executed a mortgage on the property in the name of W. B. Bailey & Son, as mortgagors, the mortgage reciting that W. B. Bailey and W. W. Bailey were partners. W. B. Bailey subsequently attempted to set up a homestead exemption as sole owner of the property when suit was brought upon the mortgage. The court said, at page 420: "They [the Baileys] and their vendees are estopped to deny the partnership against persons dealing with it without notice of the fact that W. W. Bailey had no interest. . . . W. W. Bailey must be regarded as having owned an equal interest with W. B. Bailey in the lot sued for. W. B. Bailey could not have a homestead interest in that part of the lot, the apparent title to which was in W. W. Bailey. His homestead claim could in no event cover more than his own interest in the property." The cases cited in 31 C. J. 68, note 94; page 70, § 1158, and page 112, note 14, §§ 1208 and 1211, though decided with reference to the peculiar institution of "community property," seem to enforce a similar principle.

In Earnest v. Cuthbertson, 6 W. N. C. 199, the husband had title, the property being actually his wife's. His mortgagee was held protected. The Supreme Court said: "This case is governed by the recording acts. The title was in the name of the husband. It did not come through the wife, and there was no notice of a trust for her use. It is a clear case where the mortgagee is protected under the law for recording deeds against a secret unrecorded equity of which he had no notice." The present case seems even stronger, as the supposed Mrs. Nye's equity was impaired by her own act. In Prouty v. Marshall, 225 Pa. 570, the Supreme Court said, at page 573: "The object of the recording acts is to give notice to the world of that which is spread upon the record. Therefore, the record is constructive notice to all persons, without regard to the fact of actual notice . . . and every one is bound to take notice of what the record shows, and searchers may rely upon the record as it stands. If this were not so, no one would be safe in purchasing real estate, or in loaning upon the strength of it, as security." The supposed Mrs. Nye, in deliberately and knowingly creating a record which would certainly affect the title, and would with equal certainty mislead and tend to deceive title searchers as to the true status of the title, raised an estoppel against herself to deny her representations, as against one innocently relying thereon without actual knowledge to the contrary. The so-called Mrs. Nye died. Thereafter, Nye fraudulently conveyed the premises as surviving tenant by the entireties. Mrs. Nye had made it possible for him to do this, and her heirs at law, the

present plaintiffs, are in privity with her and are bound by whatever estoppel exists against their ancestor in title: Kesselman's Lessee *v.* Old, 4 Dallas, 168, 21 C. J. 1108. The estoppel may effectively deprive them of the benefit of their inheritance, but a failure to estop them may with equal likelihood deprive Nye's vendees and encumbrancers of their advances. The plaintiffs are volunteers, that is to say, they have paid nothing. The Roats and Brumbach have paid substantial consideration for their deed and mortgage. The equities are, therefore, all in favor of the latter, unless it be shown that they had actual knowledge of the facts.

The evidence is that Nye handed to Roat the deed from the Fishers to Nye and Carrie Nye, his wife, and also handed to Roat the old mortgage given by himself and Mrs. Nye, and that he informed Roat that he and decedent were common-law husband and wife. Roat thereupon made inquiries as to the facts and the law, and employed Umbenhauer to search the title. The latter approved it, and the transaction was consummated. Was Roat bound in good faith to seek out decedent's children by a former marriage, the plaintiffs herein, and ask them whether Nye was married to their mother? Roat never knew decedent. Roat did not know Nye prior to the time of the transaction, and met Nye not more than three times till the deed was delivered. At the first meeting Nye showed him the papers above mentioned, together with some receipts, and Roat, upon inquiry, ascertained that the pair went by the name of Nye and Mrs. Nye. Roat did not know the children. Roat relied on the recorded papers and on the search made, and the searcher relied on the record. Roat never learned anything to suggest that Nye and decedent were not husband and wife. All the evidence shown him indicated that they were husband and wife. He was not bound to presume or suspect an illicit relation between Nye and decedent, nor any fraud or deceit on the part of Nye. A common-law marriage is quite lawful, and he was properly so advised. Every paper shown to him, every statement made to him, indicated that the title was good, and he was not reasonably bound to seek and question the children, who were strangers to the title. True, a very careful man might have done so, but we have been shown no evidence that should or could have raised a reasonable suspicion in Roat's mind. Roat knew nothing of Nye or the decedent or their past. The Weissers told him nothing to raise a suspicion, and it is by no means certain that they themselves had reasonable grounds to consider the pair not man and wife. Their testimony leads to no such conclusion. Nor is the alleged conversation between Mrs. Baeighkley and Weisser a denial of Nye's title, nor can we infer that he told Roat of it.

The plaintiff Edward's testimony, at page ninety-seven, denied that he ever spoke with Weisser about the children's interest. At page ninety-eight he testified that on one occasion he did tell Weisser the children owned one-half of the property, and at page ninety-nine he testified that he told Weisser that the children owned all of it. This conversation, the witness said, took place some time in October, 1928, in the back yard of the property, at the back door, and lasted an hour and a half. However unreliable this testimony may seem to be, it can little avail plaintiffs, even if believed, if not brought home to Roat. The only evidence to fix Roat with knowledge of the facts is the testimony of Edward Heckman that he saw Mrs. Roat at her home on December 2nd, and told her he claimed the property as a child of the decedent. She denies that this meeting happened before the transaction had been consummated, and says that he told her he had seen it in the newspaper. Weisser corroborated her to some extent. Edward does not tell us how he learned of the sale, excepting that he says he learned it through his sister; nor are we

told how she learned of it. He further testifies that a good friend, Earl Fix by name, drove him from Temple to the Roats' dwelling at the time when he met Mrs. Roat, but he does not call Fix to corroborate him as to the date, nor does he explain the absence of Fix. On familiar principles, we ought fairly infer that if Fix had testified, his testimony would have been adverse to plaintiffs.

The burden is on the plaintiffs to show by the fair weight of the testimony that the Roats had notice. It is not enough to raise a doubt. As to Brumbach, the mortgagee, there is no evidence that he ever knew or should have known the actual facts as to the title, or facts sufficient to place him reasonably on notice thereof. The allegations of the tenth paragraph of the bill, as to the actual knowledge of the Roats, have not been sustained. The burden was on plaintiffs to sustain them, and the plaintiffs' right to a decree falling as against the Roats, must likewise fall as against Brumbach, the mortgagee.

### Conclusions of law.

1. Clayton P. Nye and Carrie Heckman were at no time husband and wife.
2. They were not tenants by the entireties.
3. They were tenants in common of the property No. 1657 North Ninth Street, and each owned an undivided moiety.
4. On the death of Carrie Heckman, her undivided half interest in the property devolved in accordance with the intestate laws of Pennsylvania, and her children, the present plaintiffs, have an interest therein.
5. The plaintiffs are volunteers, and as to the premises No. 1657 North Ninth Street are in privity with Carrie Heckman, their mother, as her heirs.
6. Plaintiffs are estopped in equity from setting up against the defendants, Luther E. Roat and Mamie E. Roat and William Murray Brumbach, plaintiffs' rights as heirs at law of Carrie Heckman in the property No. 1657 North Ninth Street, Reading, Pennsylvania.
7. Plaintiffs are estopped in equity from setting up against defendants Luther E. Roat and Mamie E. Roat and William Murray Brumbach the fact that Clayton P. Nye and Carrie Heckman were not tenants by the entireties of premises No. 1657 North Ninth Street, Reading, Pennsylvania.
8. Clayton P. Nye had no right to convey or encumber the plaintiffs' moiety of said premises.
9. The plaintiffs are estopped in equity to set up this want of power against the Roats and Brumbach.
10. Defendant Nye's unauthorized act in conveying the fee has damaged plaintiffs to the amount of the value of their interest in the property, and he is liable to them for the amount of such damage.
11. Plaintiffs' damages are $917.76, with interest from December 12, 1928. It is hereby ordered, adjudged and decreed that the defendant, Clayton P. Nye, pay to plaintiffs the sum of $917.76, with interest from December 12, 1928. Defendant Clayton P. Nye is hereby declared and adjudged to be a trustee for the plaintiffs of said amount, and is ordered to account for and pay to them the said amount at once upon final decree becoming absolute, together with lawful interest up till the time of payment.
12. The bill should be dismissed as against defendants Luther E. Roat and Mamie E. Roat and William Murray Brumbach.
13. Defendant Clayton P. Nye shall pay all the costs of this suit.

And now, to wit, July 3, 1930, the prothonotary is directed to enter a decree *nisi* in accordance with the foregoing decision, and forthwith to give notice thereof to the parties or their counsel of record *sec. reg.*

From Charles K. Derr, Reading, Pa.