## Osterling's Estate.

Argued April 23, 1936. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

24

*John E. Evans, Sr.*, with him *S. C. Pugliese*, of *Pugliese & Evans*, for appellant.

*Oliver K. Eaton*, with him *John M. Russell*, for appellees.

OPINION BY MR. JUSTICE DREW, June 26, 1936:

F. J. Osterling, a well-known Pittsburgh architect, died testate on July 5, 1934, devising and bequeathing his entire estate to collateral relatives with the exception of a bequest of $10,000 to one Martha O. Aber. She subsequently claimed to have been his common-law wife and filed a widow's election to take against the will. A petition to show cause why the election should not be stricken from the records was presented by the executors. After hearing, the chancellor found that no marriage had taken place and entered a decree annulling the election and directing distribution of the balance of the estate—$1,233,290.59—in accordance with the terms of the will. The present appeal followed.

Claimant first met decedent in 1924, when she was 39 years of age and he was 20 years her senior. They soon became intimate friends. She testified that the alleged marriage took place on August 20, 1927, while she and

decedent were having dinner with four other friends of the claimant. Her testimony, and that of the alleged witnesses, all of which was characterized as suspicious by the chancellor, who saw and heard them, was to the effect that decedent and herself had mutually agreed, in words of the present tense, to take each other as husband and wife. If the capacity of the parties be assumed, this evidence was, if believed, clearly sufficient, as the court below conceded, to prove an effective common-law marriage. The difficulty with appellant's case—and it is a fatal one—is that the chancellor did not believe, even if it be supposed that appropriate words were used, that the parties then or ever looked upon the "ceremony" save in a frivolous light, or that they then or ever had any intentions of becoming husband and wife. His conclusion is well supported by the evidence. During the seven years from the time of the alleged marriage until the testator's death the conduct of the parties was at all times perfectly consistent with their prior separate existences and utterly inconsistent with any alleged marital status. While it appears that decedent purchased a few gifts for claimant from time to time, there is no reliable evidence that decedent ever contributed anything to her support. During their frequent meretricious sojourns in various hotels, usually in Pittsburgh, they registered as Mr. and Mrs. J. C. Aber. There was never any announcement of the alleged marriage. Claimant attempted to explain the secrecy by saying that decedent did not want to incur the wrath of his maiden sister—a highly improbable explanation—and that she herself feared possible objections upon the part of her father. It is significant, however, that no public announcement was forthcoming upon the death of her father, and that there never were, prior to the decedent's death, any objective manifestations of the alleged fact that she was his wife.

Aside from the discredited evidence as to the events which transpired at the alleged "ceremony," appellant's

case consisted of little more than the testimony of several witnesses who testified that she introduced decedent as her husband and that decedent had introduced her as his wife. This is readily explained, however, when it is remembered that their relations were very intimate and were, therefore, at times embarrassing. To forestall comment it was only natural, as the chancellor pointed out, "for both of them, when occasion required, to say something to relieve themselves from suspicion." Moreover, the overwhelming weight of the evidence was to the effect that the deceased was always known as a bachelor and that claimant did not at any time prior to his death pretend to be his wife. This evidence of reputation of the parties, coming as it did from both sides, was clearly admissible. Finally, as we said in *Levy's Estate,* 307 Pa. 522, at page 524: "The mere fact that decedent introduced claimant to a few persons as his wife is not sufficient to raise a presumption of marriage especially since he was generally known as a single man and claimant as a single woman." The alleged statements in the present case were more indicative of deception than of truth.

Complaint is made of the alleged improper admission of evidence tending to attack appellant's character, prejudice the chancellor and prevent her obtaining a fair hearing. We see no merit in the objection. The record is replete, however, with the details of claimant's relations, matrimonial and otherwise, with other men. It is argued by appellees that she was the common-law wife of one Brownlow at the time of her alleged marriage to decedent and that it was therefore impossible for her to have become the wife of the deceased. This was a perfectly proper defense, and evidence in its support was clearly admissible. In turn, it is argued in claimant's behalf that at the time of her supposed marriage to Brownlow she was lawfully married to one Hart (whom she had not seen for years and from whom she was divorced in 1926, prior to the alleged marriage with the present decedent), and that she was therefore legally in-

competent to enter into the marriage with Brownlow relied upon by appellees for the purpose of defeating any possible marriage with the deceased. If the recital of the details of her relations with these men was embarrassing to claimant, it must be apparent that it was brought about by the very nature of the case. We do not deem it necessary, however, to inquire into her marital status at the time of the alleged marriage. That issue is immaterial in view of the chancellor's finding, with which we are in accord, that no marriage was ever contracted between decedent and claimant, not because one of the parties was legally incapacitated, but because there was in fact no mutual agreement to become husband and wife. However, it may be noted in passing that when Brownlow died in Detroit in 1932 claimant arrived there directly after the funeral, announced herself as his widow, visited the hotel where he lived and the place where he worked, the physician who cared for him, the undertaker who buried the body, and the cemetery of interment. On all of these occasions she represented herself to be Brownlow's widow. While there she went through the few personal effects left by him, taking those which she wanted, and ordering the destruction of others. All of this occurred during the very time she now claims that she was married to the present decedent. In truth, the record of appellant's relations with other men (of which, from all that appears in the record, decedent was completely unaware) pictures a very characteristic background, and one not entirely consistent with a claim that must, if it is to succeed, be grounded in good faith. Cf. *McGrath's Estate,* 319 Pa. 309.

No useful purpose would be served by a prolonged repetition of the extensive evidence produced on the hearing of this case. Our review of the record leaves no doubt in our minds that the relations between appellant and the deceased were entirely meretricious and that no marriage of any kind was ever contracted. We have re-

peatedly reiterated the heavy burden that the law must necessarily impose upon one who seeks to establish a common-law marriage. "When it is attempted to establish marriage without the usual formalities, we should examine the professed contract with great scrutiny, and be entirely satisfied this solemn undertaking has been entered into by the voluntary assent of both parties": *Stevenson's Estate*, 272 Pa. 291, at page 296. Especially is this true when one of the parties is dead. "When the lips of a man are sealed by death, and he leaves no satisfactory evidence as to the existence of such contract, courts will be very slow to establish it in derogation of the undoubted rights of those who follow him": *Stevenson's Estate, supra*, at page 301. The chancellor's finding that appellant was not the wife of the deceased was approved by the court in banc, and, since the finding was based upon sufficient and competent evidence and no manifest error or mistake appears, that finding is conclusive upon this court: *Stevenson's Estate, supra; Levy's Estate, supra; Kovacevich's Estate*, 309 Pa. 268; see *Comly's Estate*, 185 Pa. 208, 216; *Krystkiewicz's Estate*, 310 Pa. 298, 299. Appellant failed completely to carry the burden which the law imposed upon her, and this because of the inherent weakness of her claim.

Appellant's case is fraught with suspicious circumstances. Her answers throughout were most carefully guarded, and on cross-examination were most evasive. As the chancellor aptly pointed out, "Her requests and admonitions to [one of appellees' witnesses] . . . to see that no information of her relations with Brownlow should be divulged; her directions to destroy all letters; and her statement that she would have a hard fight to get her share of the estate, do not strengthen her case. If she had been married in the presence of four witnesses, all of whom were living and willing to testify in her behalf, she would have had no fear of the outcome of her claim, nor would there have been anything to her advantage in suppressing the evidence of her relationship

with Brownlow." Not without significance is the fact that claimant produced many letters written by her to decedent subsequent to the date of the alleged marriage, which, although endearing, contained no indication that the addressee was the writer's husband. In spite of the fact that many of these letters acknowledged receipt of letters from decedent, none of the latter was offered. If the parties really regarded themselves as husband and wife, it is inconceivable that there would not be some corroboration thereof in their correspondence. The chancellor came to the conclusion that her testimony was entirely incredible, as was that of the friends who sought to corroborate her, some of whom, while on the witness stand, apparently manifested an unusual interest in the outcome of the case. The language of this court in *Stevenson's Estate, supra,* is not inapplicable here. We there said, at page 301, speaking through the present Chief Justice: "Decedent's conduct may have been the subject of severe censure, as his acts offended all moral laws. . . . But a marriage cannot be presumed from such acts, for to do so would place a premium on illicit relationship. Claimant, better than anyone else, knew her exact standing with [decedent]. She knew she was not accorded the rights of a wife or anything that resembled them. She likewise knew the reason. Those who, with a clear understanding of what the laws require, embark in undertakings such as those found by the court below, must abide by the consequences of their acts. The court will not relieve them unless it plainly appears there was an actual agreement to form the legal relation of husband and wife."

In final analysis, the present appeal is nothing more than an attempt to overthrow the chancellor's finding. The numerous assignments of error have been very carefully considered. Not only do we find no errors in the various rulings on the admission of evidence, but we cannot agree that the claimant did not have "a fair and impartial hearing and determination of her claim." In our

30

opinion, the assignments of error are all without merit, and they are therefore overruled.

The decree is affirmed at appellant's cost.