479 A.2d 537

In re Rodney J. CUMMINGS ESTATE.

Appeal of Kenneth CUMMINGS, Executor.

Superior Court of Pennsylvania.

Argued Jan. 18, 1984.

Filed June 22, 1984.

256

258

Melvin E. Newcomer, Lancaster, for appellant.

Robert A. Longo, Lancaster, for participating party.

Before ROWLEY, HESTER and ROBERTS, JJ.

ROWLEY, Judge:

Kenneth Cummings (appellant), who is one of the brothers of decedent, appeals from the judgment entered in favor of Patricia Schwartz Cummings (Patricia), appellee, for a statutory share of the decedent's estate as his surviving common-law wife. Appellant is named both as a beneficiary and the executor of the estate in decedent's last will and testament. The only question before us is whether the trial court erred in determining that a common-law marriage existed between appellee and the decedent. Upon a thorough review of the record in this case, we reverse.

Rodney J. Cummings died testate on June 24, 1979. His will, dated February 5, 1973, named his brother, Kenneth Cummings, as Executor and left his estate to his three brothers, including appellant, in equal shares. Patricia filed an election to take a statutory share of decedent's estate under the Probate, Estate and Fiduciaries Code, 20 Pa.C. S.A. § 2203, on September 17, 1979. The appellant then filed a petition to vacate the spousal election and a hearing was held on April 9, 1981 before the Court of Common Pleas in Clinton County, at which time witnesses testified for both parties.

The factual findings of the trial court are undisputed on appeal. Patricia met Rodney Cummings in 1972 on a blind date during the time that both parties resided in Lancaster County, Pennsylvania. The parties continued dating until December 1974, when Patricia moved into decedent's residence in Manheim, Lancaster County, along with her two sons. The Court specifically found that the parties were not married to each other when Patricia moved into Rodney's residence.[1] Furthermore, the court found that they did not hold themselves out as husband and wife during the time they lived in Manheim. On August 9 or 10, 1975, Patricia and Rodney dined out at the Mansion House Restaurant. In the course of their conversation, Rodney remarked that it had been three years since they had met,

---

**1.** The Court also found that neither party had been previously married to anyone else.

that he was happy, and that he felt like he was a married man. He then gave Patricia a diamond ring, which she accepted and he told her to wear it whenever she left the house.

Decedent was employed with Pennsylvania Power and Light Company (PP & L) and worked primarily in Clinton County, although he returned to his home in Manheim on weekends. In 1977, decedent purchased a home in Renovo, Clinton County, titled in his own name. He telephoned Patricia and stated: "I bought you a home." Patricia voiced her resistance to the idea of moving to Clinton County but Rodney insisted: "You are my wife. You are going to move." Thereafter, Patricia moved to Rodney's newly acquired home in Renovo with her two sons and they resided there until Rodney's death. While they lived in Renovo, Rodney introduced Patricia as his wife in conversations with George R. Schroat, an employee of PP & L, William W. Hepner, a neighbor for whom Rodney did yard work, and Paul F. Maxwell, the football coach at the school that Patricia's sons attended. Two of decedent's co-workers at PP & L, Leroy Hack and Jonathan Rishel, were aware that Rodney and Patricia were not legally married. However, both workers stated that Rodney often referred to Patricia as "my wife" or "my woman" and that he referred to Patricia's sons as "my boys". Mr. Rishel encouraged Rodney to solemnize the marriage but Rodney's response was: "I don't need a piece of paper to prove I'm married. I am married."

However, Rodney told his brother Kenneth Cummings, on numerous occasions, that he was not married to Patricia. The last time he told Kenneth that he was not married was on June 1, 1979, when he returned to Lancaster County for a relative's funeral. On the day of the funeral, Rodney also told his father Richard Cummings, as he had on other occasions, that he was not married to Patricia and that he did not intend to marry her. Patricia received benefits from the Pennsylvania Department of Public Welfare from 1969 until 1977 when she moved to Clinton County, at which time

she withdrew her claim. Patricia would have been ineligible for welfare benefits if she were married. While Patricia resided with Rodney, she continually received welfare benefits for her children, and on May 3, 1979, she signed a review form from the Department of Public Welfare wherein decedent was referred to as her "paramour". During the entire time Patricia lived with Rodney, they did not have joint checking or savings accounts and Patricia did not change her name on her driver's license, voter registration, auto registration or social security cards. Furthermore, Rodney filed United States Individual Income Tax Returns for the years 1975 through 1978 listing himself as an unmarried head of household and in 1978 he completed a credit application wherein he indicated that he was not married.

In its conclusions of law, the trial court determined that the parties entered into a common-law marriage when they moved to Renovo, Clinton County in 1977. The court held that the parties cohabitation and reputation as husband and wife in the Renovo area raised a presumption that they entered into a marriage contract. Accordingly, the court found that Rodney's statements to Patricia that he bought her a home and she was his wife, corroborated by the parties cohabitation and reputation in the community, established their intent to enter into a marriage relationship. The court did not perceive that the evidence offered at the hearing that contradicted the existence of a common-law marriage was sufficient to rebut the presumption of marriage.

Appellant argues alternatively: 1) that no presumption of common-law marriage was created by evidence of the parties' cohabitation and reputation under the circumstances of this case, and 2) that if the evidence was sufficient to raise a presumption of marriage, the presumption was rebutted by evidence that the decedent never intended to be married to appellee. We find appellant's first argument to be persuasive.

■ Our scope of review in an appeal from the final decree of the orphans' court is very narrow. The findings of the court, supported by competent evidence of record are entitled to the weight of a jury's verdict; such findings are controlling and the court's decree should not be reversed unless the court abused its discretion or committed an error of law. *Adoption of S.H.,* 476 Pa. 608, 611, 383 A.2d 529, 530 (1978); *see Hankin v. Hankin,* 279 Pa.Super. 179, 196, 420 A.2d 1090, 1099 (1980). The resolution of conflicts in the evidence presented is for the trier of fact. *In Re Estate of Garges,* 474 Pa. 237, 243, 378 A.2d 307, 310 (1977). We recognize that the decree of the orphans' court may not be disturbed unless the court applied an incorrect legal standard, *see Adoption of S.H., supra.* However, we note that whether a person has been legally married to another is a mixed question of law and fact. *See Baker v. Mitchell,* 143 Pa.Super. 50, 55, 17 A.2d 738, 741 (1940).

■ Under Pennsylvania law, marriage is a civil contract. No specific form of words is required to create the contract; all that is necessary is "proof of an agreement to enter into the legal relationship of marriage at the present time." *Estate of Gavula,* 490 Pa. 535, 540, 417 A.2d 168, 171 (1980); *In Re Estate of Garges,* 474 Pa. at 241–242, 378 A.2d at 308–309. *See Gower Estate,* 445 Pa. 554, 284 A.2d 742 (1971). Our courts will find a valid marriage if there is sufficient evidence to prove that it was the parties intention to enter into a marriage relationship. *In Re Estate of Stauffer,* 315 Pa.Super. 591, 462 A.2d 750 (1983); *Commonwealth ex rel. McDermott v. McDermott,* 236 Pa.Super. 541, 544–545, 547, 345 A.2d 914, 915–917 (1975). Because of the problems of proof associated with establishing the existence of a marriage contract, our courts have developed certain presumptions.

■ Constant cohabitation of a man and woman together with a *general* reputation as husband and wife in their community raise a presumption that the parties have contracted marriage. *In Re Estate of Garges,* 474 Pa. at 241, 378 A.2d at 309; *Manfredi Estate,* 399 Pa. 285, 291,

159 A.2d 697, 700 (1960). *See VanBrakle v. Lanauze,* 293 Pa.Super. 276, 438 A.2d 992 (1981). However, the presumption is rebuttable and it "will wholly disappear in the face of proof that no marriage existed." *Commonwealth ex rel. McDermott v. McDermott,* 236 Pa.Super. at 544, 345 A.2d at 915. Moreover, a presumption of marriage based on cohabitation and reputation *will not* arise where the parties admit that they lived together unmarried up to the time of the alleged agreement to create a marriage relationship. *See Stevenson's Estate,* 272 Pa. 291, 297, 116 A. 162, 164 (1922). Where a relationship between a man and a woman is "illicit and meretricious" in its inception, it is presumed to so continue during the cohabitation of the parties. That presumption will be rebutted only if the consent of both the parties to enter into a valid marriage is established by *clear and convincing* evidence. *Stauffer Estate,* 372 Pa. 537, 539, 94 A.2d 726, 727–728 (1953); *Commonwealth ex rel. DeMarco v. DeMarco,* 166 Pa.Super. 69, 71, 70 A.2d 384, 386 (1950). *See In Re Estate of Garges, supra; Brown v. Atlantic and Gulf Stevedores, Inc.,* 2 Pa.Commw. 481, 279 A.2d 372 (1971). Finally, a claimant who asserts the existence of a marriage bears the burden of proving by clear and convincing evidence that a change in the meretricious status occurred.[2] *See e.g., Commonwealth ex rel. DeMarco v. DeMarco, supra; In Re Estate of Garges, supra.*

 In this case, the trial court determined that the parties were not married to each other when Patricia moved into Rodney's house in Manheim in 1974. That finding was amply supported by the record. Indeed, Patricia testified that they were only living together when she resided with Rodney in Manheim in 1974, and that she did not feel married at that time. The trial court further determined that the words spoken between Rodney and Patricia at the Mansion House Restaurant in 1975 were insufficient to

---

**2.** Although this strict burden of proof was formulated in early case law, we are convinced that it is equally compelling at present, given the legal significance of the marriage relationship as compared with the nature of a casual agreement to live together for the sake of companionship and shared expenses.

establish a common-law marriage and that conclusion has not been challenged. It is clear then that Rodney and Patricia lived together *unmarried,* for a number of years at the outset of their relationship; thus, their relationship began meretriciously. *See Baker v. Mitchell,* 143 Pa.Super. at 56, 17 A.2d at 741. Accordingly, we find that the trial court committed an error of law in concluding that the cohabitation of Patricia and Rodney, together with the fact that they were known to some people as husband and wife after they moved to Clinton County in 1977, raised a presumption that the parties entered into a marriage contract at that time. On the contrary, there is a presumption that the parties continued to live together *unmarried.* The burden was on appellee to rebut that presumption by presenting clear and convincing evidence that her relationship with decedent had been converted into a valid marriage. Moreover, the trial court was compelled to view the purported marriage agreement with heightened scrutiny, since appellee claimed that she was entitled to share in the distribution of decedent's estate in derogation of the terms of his will.[3] Applying these legal principles to the facts in this case, we find that appellee failed to meet her strict burden of proving that the parties status changed upon their move to Clinton County in 1977.

Although Rodney told Patricia that he bought her a home and that she had to move because she was his wife, these statements, by themselves, do not establish a present agreement to marry. *See e.g., Commonwealth ex rel. DeMarco v. DeMarco, supra.* The only other evidence

**3.** Our courts have regarded common-law marriage as a fruitful source of fraud and perjury and, thus, the law imposes a heavy burden on one who grounds a claim upon the existence of a common-law marriage. *Estate of Gavula,* 490 Pa. at 540–541, 417 A.2d at 171; *Osterling's Estate,* 323 Pa. 23, 27–28, 185 A. 790, 792–793 (1936). This is especially true where the lips of one of the parties are sealed by death and the marriage contract is asserted as the basis of a claim to share in the distribution of the decedent's estate. *Estate of Gavula, supra; Manfredi Estate,* 399 Pa. at 292, 159 A.2d at 701; *Osterling's Estate, supra.* In such a case, courts will examine the purported marriage contract with great scrutiny. *Commonwealth ex rel. McDermott v. McDermott,* 236 Pa.Super. at 551, 345 A.2d at 918.

offered to support a determination that the parties intended to establish the relationship of husband and wife was the evidence concerning their reputation as man and wife. This evidence was limited to the testimony of two of decedent's co-workers, Patricia's sons' football coach, and two other casual acquaintances. On the other hand, there was substantial competent evidence that the parties acted in a manner that was inconsistent with the existence of a marriage agreement.

Rodney told Patricia that he bought her a home, however, he titled the house in his name only. Although Patricia discontinued her claim for welfare benefits from the Pennsylvania Department of Public Welfare when she moved to Renovo, she did not inform the Department that she was married. Indeed, on May 3, 1979, shortly before Rodney's death, she signed a review form from the Department wherein she referred to decedent as her "paramour." Less than one month before Rodney's death, he told his brother and his father that he was not married to Patricia. In response to his father's question whether he intended to marry Patricia, Rodney stated; "No way." (RR. 152). Patricia and Rodney did not maintain joint checking and savings accounts, nor was there evidence that either party was listed as a beneficiary on an insurance policy executed by the other. *Compare, In Re Estate of Garges, supra* (common-law marriage corroborated by evidence that the parties took out life insurance policies naming each other as spouse-beneficiaries); *Stauffer Estate, supra* (common-law marriage supported by evidence that parties resided together 13 years, took title to real estate as husband and wife as tenants by the entireties, and wife took out life insurance policy naming husband as beneficiary). Moreover, Rodney filed federal income tax returns listing himself as unmarried during the entire time he lived with Patricia. In addition, Rodney indicated that he was not married on a credit application completed in 1978. *Compare Commonwealth ex rel. McDermott v. McDermott, supra* (agreement to establish the legal relationship of husband and wife was

supported by evidence that wife was named as beneficiary on husband's insurance policies and pension plans and that parties filed joint tax returns claiming married status).

■ On the basis of these undisputed facts, we find that appellee failed to satisfy her strict burden of proving by clear and convincing evidence that she and Rodney entered into an agreement to establish a marriage relationship. The corroborative evidence offered by appellee to prove that a common-law marriage took place was far outweighed by contrary evidence that Rodney and Patricia did not intend to enter into the legal relationship of marriage.

Judgment reversed.

Jurisdiction relinquished.