REGINA CROSS, Respondent-Appellant, v CHRISTOPHER CROSS, Appellant-Respondent.

First Department, April 25, 1989

## APPEARANCES OF COUNSEL

*Philip A. Greenberg* of counsel *(Segal & Greenberg,* attorneys), for appellant-respondent.

*Stuart A. Jackson* of counsel *(Enid W. Langbert* with him on the brief; *Blodnick, Pomerantz, Reiss, Schultz & Abramowitz, P. C.,* attorneys), for respondent-appellant.

## OPINION OF THE COURT

Sullivan, J.

This appeal, the fourth in this matter, is from an order, after trial, declaring that the parties had, as claimed by plaintiff, entered into a common-law marriage. Such marriages were abolished in New York in 1933. (L 1933, ch 606.) On an earlier appeal (102 AD2d 638), this court, in reversing a grant of summary judgment in favor of defendant, held that the issue for trial would be whether the parties had contracted a common-law marriage during two 1982 trips, one to Pennsylvania and the other to Washington, D.C. On our review of the record, we are unable to find a factual basis for the trial court's determination and, accordingly, reverse.

The parties' relationship commenced in 1964, when each of them was married to someone else. They began to cohabit in 1965. Plaintiff divorced her then husband one year later. Defendant obtained a divorce from his former wife in 1979. The parties lived together in New York from 1965 until the early part of 1983, when they separated. Although they traveled from time to time to other jurisdictions, they never resided in any other State and, in any event, their trips could not have had any impact on their relationship, at least not until 1979, when defendant was divorced from his second wife.

Plaintiff's witnesses generally testified about events which occurred before defendant's 1979 divorce and which took place in New York, where plaintiff was known as Regina Cross, or Mrs. Cross or as defendant Christopher Cross's wife. One nonparty witness, plaintiff's cousin, Craig Wine, testified about a weekend which the parties spent in Washington, D.C. in 1982. He was on a reception line at a prewedding dinner when he "turned around and [defendant] introduced himself, and he said, 'you know my wife, Regina Cross'."

Among the trips about which plaintiff testified were those to Colorado, Pennsylvania and Rhode Island, all of which occurred before defendant's 1979 divorce. Moreover, the trips

were of short duration, and involved minimal contact with others. Plaintiff testified extensively about a 1982 weekend trip to Pennsylvania to the home of Maya Brooks, where the parties shared the master bedroom. The activities included an evening at a restaurant, at which defendant, in the presence of the others, ordered dinner for his "wife". Also, in referring to a past event between them, he described it as having occurred at a time before they were married. Defendant denied making such statements.

Plaintiff also testified about the 1982 trip to Washington, D.C. She and defendant stayed two nights at a Holiday Inn, at which they registered as Mr. and Mrs. Christopher Cross. Plaintiff characterized defendant's introduction of her—"Well, I suppose you know my wife Regina"—to her own family as "kidding". Over objection, plaintiff was allowed to answer "yes" in response to the question, "at any time during your 18-year relationship with Mr. Cross, yes or no, did you consider yourself married to him?".

In addition to his own testimony, essentially denying the existence of a common-law marriage, defendant presented two nonparty witnesses, whose testimony was significant. Dr. Joseph Eron, a child psychologist, testified that when he met with the parties in late 1982 he found a problem because of, as he put it, plaintiff's "concern that they had never, in fact, been married". Loris Blake, the parties' housekeeper during the years that they lived together, testified that they argued constantly about plaintiff's desire to be married. Specifically, Ms. Blake gave the following testimony: "Well, Regina would say, 'if you don't marry me, I'm going to take my child and leave and then you'll never see me again.' And then Mr. Cross would say, 'Well you can go wherever you want to, because I didn't tell you to come here. You're the one that moved in here. So wherever you want to go, you can go' ".

As Ms. Blake explained, in the arguments over his refusal to marry plaintiff defendant would always explain that he was married and had two children, "and even if I am divorced, I would never marry you". After the 1979 divorce, he would say, "I am not going to marry you, and I'm not going to marry anyone else. So wherever you want to go, you can go". Ms. Blake testified that she never heard either of the parties introduce the other as husband or wife.

Consistent with plaintiff's testimony, defendant testified that the only State in which he ever lived with plaintiff was

New York. With respect to the 1982 trip to Pennsylvania, he testified that they stayed only one night, while plaintiff testified that they had stayed two nights. References to each other during that weekend were as "Chris" and "Regina" and no one, including the parties, referred to them as each other's husband or wife. Defendant vehemently denied any references during the stay to a time before or after the parties' marriage, "Absolutely not, because I had no marriage".

Defendant also testified, consistent with plaintiff's testimony, that the parties had stayed for two nights during the trip to Washington, D.C. He added that at the prewedding dinner neither party introduced the other as his or her husband or wife. In fact, since the dinner guests were all members of plaintiff's family, defendant did not have to introduce her at all. The only reference to the parties' marital status occurred when one of plaintiff's relatives jokingly asked defendant when he would be getting married, to which he responded "no, thank you very much". Defendant also testified that when the parties visited plaintiff's parents, they did not use the same bedroom, since they were not married and plaintiff's mother was "old-fashioned". Defendant stated, not inconsistently with plaintiff's testimony, that he divorced his former wife in 1979 as a tax-saving device, so that he could deduct the alimony payments. In deposition testimony received in evidence, Gila Ramras-Rauch, a friend of plaintiff, described a conversation with plaintiff in or about 1980, in which plaintiff complained that defendant did not want to marry her, and that she was "very desolate about it". William C. Moss, an attorney and friend of the parties, testified about a telephone conversation he had with plaintiff: "Regina told me, after the usual pleasantries, how distressed she was because Christopher refused to marry her. She asked me to tell Christopher when he arrived at my home for a visit that unless he married her, she was prepared to take their son to Israel and that she would not return."

Moss' testimony ended with the following question and answer:

"Q. From 1979 to the present, did Christopher Cross and plaintiff hold themselves out to be husband and wife to you or anyone else you know?

"A. No."

In declaring that a common-law marriage existed between plaintiff and defendant, the trial court apparently credited all

of plaintiff's evidence while totally rejecting defendant's except where the testimony was consistent. While considerable deference should be paid to a trial court's assessment of credibility *(Matter of Liccione v John H.,* 65 NY2d 826, 827), we have great difficulty in accepting plaintiff's account of the weekend in Washington, D.C. For example, the court found that defendant introduced plaintiff to the members of her own family as, "my wife Regina", despite the implausibility that he would have to introduce her to her own family. Similarly, with respect to the lunch they attended, the court found, "Again, defendant ordered food for the parties and told the waiter 'my wife would like' ". Not even plaintiff had testified that defendant had ordered for her on that occasion; nor did plaintiff testify that defendant referred to her as his wife. In any event, even if every single factual issue is resolved in plaintiff's favor, defendant is still entitled to judgment as a matter of law.

With respect to the controlling legal principles, the court relied on the law of Pennsylvania, which, seemingly, lent more support to the finding of a common-law marriage. The decisions cited by the court, however, involved cases where the parties clearly entered into an agreement in Pennsylvania to be married, and had been residents or at least had cohabited for a significant period of time in that State and were known in the community as husband and wife.

Acknowledging that Washington, D.C., "follows a somewhat more rigid approach than Pennsylvania", but without finding that the criteria for a common-law marriage in Washington D.C., had been met, the court concluded that "[t]he confluence of the Pennsylvania trip, the Washington D.C. trip and the acts of the parties with respect to the Bar Mitzvah of their son which took place at about the same time, lead to the inexorable conclusion that the parties were married in Pennsylvania and Washington D.C.".

In *In re Estate of Kovalchick* (345 Pa Super 229, 498 A2d 374), the court stated: "Because the courts have regarded common law marriage as a fruitful source of fraud and perjury, common law marriages are to be tolerated but not encouraged. * * * Therefore, 'the law imposes a heavy burden on one who grounds his or her claim on an allegation of common law marriage.' " *(Supra,* 345 Pa Super, at 232, 498 A2d, at 376, quoting *Estate of Gavula,* 490 Pa 535, 540-541, 417 A2d 168, 171.) Repeated throughout the case law of Pennsylvania, and, indeed, Washington, D.C., is the following

rule from *Kovalchick:* "Where a relationship between a man and a woman is 'illicit and meretricious' in its inception, it is presumed to so continue during the cohabitation of the parties. That presumption will be rebutted only if the consent of both the parties to enter into a valid marriage is established by *clear and convincing* evidence" *(supra,* 345 Pa Super, at 234, 498 A2d, at 377 [emphasis in original]; *In re Cummings Estate,* 330 Pa Super 255, 264, 479 A2d 537; *see also, Chlieb v Heckler,* 777 F2d 842, 845).

In *Commonwealth v Smith* (511 Pa 343, 513 A2d 1371), the court held that in order to establish a common-law marriage there must be an exchange of words in the present tense spoken with the specific purpose that the legal relationship of husband and wife be thereby created. Since it is "often difficult to prove a common law marriage by words in praesenti, the law has created * * * a rebuttable presumption of marriage where two absolutely essential elements are conjoined and co-exist-constant, as distinguished from an irregular or inconstant, cohabitation plus a reputation of marriage, which is not partial or divided but is broad and general." *(Manfredi Estate,* 399 Pa 285, 291, 159 A2d 697, 700.) Cohabitation and reputation, however, "do not create the marriage but * * * are circumstances giving rise to a rebuttable presumption of one." *(Wagner Estate,* 398 Pa 531, 533, 159 A2d 495, 497.) The rule allowing a finding of marriage on reputation and cohabitation alone is one of necessity to be applied only where other proof is unavailable. *(Nikitka's Estate,* 346 Pa 63, 65, 29 A2d 521.)

We note that the relationship between plaintiff and defendant was "illicit and meretricious" in its inception, since plaintiff concededly began to cohabitate with defendant in 1965, some months before she was divorced from her former husband. Furthermore, defendant remained married to his second wife during the first 14 years of the parties' cohabitation, including the first 10 years after the birth of their son. On this record, plaintiff has failed to overcome the strong presumption that the relationship remain illicit and meretricious. Nor has she, in light of such relationship, demonstrated by clear and convincing evidence, as required by Pennsylvania law, that the parties agreed to enter into a valid marriage. Indeed, except for her sharply disputed testimony that defendant made a reference to a time before their marriage and that he referred to her as his wife in speaking to a waiter, there was not the slightest indication during the weekend trip to Pennsylvania of a current or even past intention to be

married.* Significantly, the court also found that the parties constantly bickered because defendant had no intention of marrying plaintiff, and, in fact, was hostile to the idea.

Nor has plaintiff shown cohabitation or reputation of the type required to evince a common-law marriage in Pennsylvania. The parties stayed there for, at most, only two nights. Plaintiff's own testimony did not even establish that their host ever considered them husband and wife. The weekend trip to Pennsylvania would not even meet the threshold requirement of *In re Estate of Rees* (331 Pa Super 225, 480 A2d 327), which held that the knowledge of a few people that the parties were husband and wife was insufficient to establish a marriage, and that proof by reputation for such purposes must be general and not confined to a few persons in an immediate neighborhood.

In *In re Cummings Estate* (330 Pa Super 255, 479 A2d 537, *supra),* the court refused to find a common-law marriage on facts which were much more supportive of such a finding. There, the purported husband gave a diamond ring to the alleged wife as a wedding ring, and it was undisputed that he had frequently referred to her as his wife. Furthermore, neither party in that case had previously been married. In rejecting the claim of a common-law marriage, the court held, "[A] presumption of marriage based on cohabitation and reputation *will not* arise where the parties admit that they lived together unmarried up to the time of the alleged agreement to create a marriage relationship." *(Supra,* 330 Pa Super, at 264, 479 A2d, at 542.)

In *Matter of Peart v Bross Line Constr. Co.* (45 AD2d 801), a New York case interpreting Pennsylvania law, a New York couple had spent 3 or 4 days at a friend's home in Pennsylvania, where they "cohabitated together, conducted and held themselves out generally as husband and wife to their hosts and to others they had occasion to meet." The parties continued to live together for the remainder of decedent's lifetime and it is clear they considered themselves to be husband and wife. Notwithstanding, the court rejected the claim of common-law marriage, holding that there had to be "evidence of a verbal expression of an intention to be married exchanged by

---

* Except for a disputed conversation alleged to have taken place on a beach in Israel in 1966 or 1967, there is no evidence whatsoever of an agreement to be married. Even if plaintiff's account of the incident were accepted, the conversation took place some 12 or 13 years before defendant's divorce.

the parties", and that "[c]ohabitation, reputation, and acknowledgment without the spoken words evidencing a present honest intent to be married will not suffice". *(Supra.)*

Nor does plaintiff fare any better under Washington, D.C., law. In *United States Fid. & Guar. Co. v Britton* (269 F2d 249), the District of Columbia circuit court, in refusing to find a common-law marriage, set the standard for the establishment of such a marriage: "[W]hatever the rule may be elsewhere, in the District of Columbia it is that when a man and a woman who are legally capable of entering into the marriage relation mutually agree, in words of the present tense, to be husband and wife, and consummate their agreement by cohabiting as husband and wife, a common-law marriage results." *(Supra,* at 251.)* Even if a two-day stay in Washington, D.C., were sufficient to establish the element of cohabitation, this record is lacking in proof of mutual consent or agreement. Plaintiff did not introduce a scintilla of evidence that she and defendant had entered into a present-tense agreement to be husband and wife while they were in Washington, D.C. As the *Britton* court observed, "[M]ere cohabitation, even though followed by reputation, will not justify an inference of mutual consent or agreement to be married". *(Supra,* at 252.)* The *Britton* court took pains also to note the oft-cited rule that "[c]ohabitation which was meretricious in its inception is considered to have the same character throughout its continuance after the removal of a real or supposed impediment. Cohabitation continued thereafter could not ripen into a common-law marriage unless it was pursuant to a mutual consent or agreement to become husband and wife made after the removal of what she supposed was a barrier". *(Supra,* at 253-254.)*

In *Johnson v Young* (372 A2d 992 [DC App]), the parties had gone through a ceremonial marriage in another jurisdiction, which, as it turned out, was invalid. Since there was evidence of four years of cohabitation in Washington, D.C., with many of the indicia that the parties were, in fact, husband and wife, including the use of the same surname, the court considered the possibility that the relationship had become a valid common-law marriage in the District of Columbia. Notwithstanding such extended cohabitation, the court found that the purported wife had failed to sustain her heavy burden of proof, noting, "To establish a common-law marriage in the District of Columbia there must be an express mutual present intent to be husband and wife, followed by good faith cohabitation". *(Supra,* at 994.)* Here, plaintiff spent, at most, a

weekend in Washington, D.C., with defendant and does not even pretend that she ever entered into a ceremonial marriage with him. Indeed, under her own version, she admits that she demanded a ceremonial marriage, but defendant always refused.

In *McCoy v District of Columbia* (256 A2d 908 [DC App]), it was held that under the law of Washington, D.C., a common-law marriage requires proof " 'that the parties cohabited as husband and wife in good faith, that is, that the cohabitation followed an express mutual agreement to be husband and wife' ". *(Supra,* at 910, quoting *United States Fid. & Guar. Co. v Britton, supra,* 269 F2d, at 252.)* In rejecting the claim that such a marriage existed, the court noted that "it cannot validly be contended on this record that existence of such an agreement can be inferred from proof of cohabitation and reputation". *(Supra,* 256 A2d, at 910.)* As in *McCoy,* there is no proof here of an agreement to be married, with cohabitation thereafter. Furthermore, plaintiff cannot establish cohabitation and reputation in Washington, D.C., on the basis of a two-day visit. She does not claim a general reputation in the District of Columbia that she and defendant were married. The evidence of reputation even among plaintiff's relatives was minimal at best. We also note, in passing, the *McCoy* court's observation about sanctioning common-law marriages: "We commend to the attention of Congress the question whether such an informal and almost uniformly misunderstood status should not be abolished to end creation of such relationships in the future. The considerations which history teaches gave rise to judicial recognition of such informal and unrecorded marital agreements can hardly justify modern day perpetuation. Cost is certainly not prohibitory, and a plethora of public and quasipublic officials are available to solemnize such an important and socially significant occasion. Certainly no one would contend that facilities for recordation are unavailable. Indeed, one might question whether any valid reason exists to encourage and sanction future circumvention of the established and salutary system for formalizing and recording marriages" *(supra,* at 910).

The case against finding a marriage under Washington, D.C., law is overwhelming and, as a close reading of its decision shows, even the trial court implicitly acknowledged that the criteria under that jurisdiction's case law had not been met. Since plaintiff has failed to establish a common-law marriage under the law of either Pennsylvania or Washing-

ton, D.C., defendant is entitled to judgment on the first cause of action and a declaration that a common-law marriage never existed. The remaining causes of action, which draw sustenance only from the existence of a valid marriage, should be dismissed.

We have examined the other issues raised by these cross appeals and find that they are without merit.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Myriam Altman, J.), entered on or about April 18, 1988, should be reversed, on the law and on the facts, without costs or disbursements, judgment awarded to defendant on the first cause of action and a declaration made that a common-law marriage between the parties never existed, and the remaining causes of action dismissed.

Ellerin, J. (concurring). I concur in the result only. *(See, Matter of Peart v Bross Line Constr. Co.,* 45 AD2d 801.)

Murphy, P. J., Ross and Kassal, JJ., concur with Sullivan, J.; Ellerin, J., concurs in a separate opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on or about April 18, 1988, reversed, on the law and on the facts, without costs and without disbursements, judgment awarded to defendant on the first cause of action and a declaration made that a common-law marriage between the parties never existed, and the remaining causes of action dismissed.