## STATE FARM FIRE & CASUALTY CO., Plaintiff,

v.

## Robert E. PLATT, Kathleen Watson, and Kenneth Sternberg, Defendants.

### No. Civ.A. 97–5253.

United States District Court, E.D. Pennsylvania.

April 29, 1998.

---

Lisa G. Miller, Philadelphia, PA, for plaintiffs.

Benjamin E. Zuckerman, W. Conshohocken, PA, Marianne E. Brown, Philadelphia, PA, for defendants.

## MEMORANDUM AND ORDER

KATZ, District Judge.

*Factual Background*

In this action, plaintiff State Farm seeks a declaration that it is not obligated to defend and/or indemnify Kathleen Watson in a pending state court lawsuit. In the complaint in the underlying state court action, Kenneth Sternberg alleges that on or about December 8, 1995, while he was visiting Kathleen Watson at a residence owned by defendant Robert Platt, she shot him with a firearm she owned. *See* Pl. Mot. Ex. A. At the time of the shooting, defendant Platt had homeowner's insurance with plaintiff State Farm. *See* Pl. Mot. Ex. B. Platt was not living at the residence at the time Watson shot Sternberg; he was incarcerated at a state prison in Camp Hill, Pennsylvania, for an unrelated shooting. *See id.* Ex. J. Watson had moved into and out of the residence prior to Platt's arrest, but she remained in the house after Platt's arrest. *See* Pl. Mot. Ex. I; Def. Sternberg Resp. Ex. 2. At all times relevant to this action, Platt was insured with a State Farm Policy which provides the following liability coverage:

> If a Claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence, we will: 1) pay up to our limit of liability for which the insured is legally liable; and 2) provide a defense at our expense by counsel of our choice.... Our obligation to defend any claim or suit ends when the amount we pay for damages, to effect settlement or satisfy a judgment resulting from the occurrence, equals our limit of liability. Pl. Mot. Ex. B at 14.

The Policy also provides the following definitions with respect to the identity of a covered person under the Policy: " 'You' and 'your' mean the named insured shown in the Declarations. Your spouse is included if a resident of your household." *Id.* Ex. B at 1. The Policy defines "insured" as the policyholder, any relatives who are residents of the household, and any person under the age of 21 who is in those persons' care. *See id.* Ex. B. at 1. Watson claims that she qualifies as a spouse under the Policy, as she is Platt's common law wife, and is therefore entitled to liability coverage.[1]

By all accounts, including their own, Kathleen Watson and Robert Platt had a rather stormy relationship. *See* Def. Resp. Exs. 1, 2. Watson and Platt met while he was married to Debbie Sue Platt. *See* Pl. Mot. Ex. J; Def. Resp. Ex. 2. On July 5, 1989, Kathleen Watson gave birth to her only child with Platt, Kristina, while Platt was still married. *See* Pl. Mot. Exs. I, D. Watson claims that she and Platt exchanged informal wedding vows in private after Kristina's birth in 1989, and that they considered themselves married after that point in time, and that their friends and other persons in the community considered them to be married. *See id.* Ex. I; Def. Resp. Ex. 2. Sternberg claims that the two had an official marriage ceremony, akin to an "elopement," that had occurred a few years before Platt's incarceration. *See* Pl. Mot. Ex. M; Def. Resp. Ex. 14. Watson's testimony differs, however; she claims that she and Platt told her mother in 1989 that they had exchanged words, and that they were planning on getting married:

> [W]e just exchanged words to each other and someday we will get married. And then every time we wanted to get married, we had a fight, so—but she knew how he was my husband. He would call her mom and everything was "Mom." ... And all of our friends knew. I mean, they'd be like, "That's Bob's wife."
>
> Q: Why did you want to get married?
> A: I just wanted to have a wedding.
> Q: You wanted to have a wedding?
> A: Well, why didn't we just stay that way or why did we want the—
> Q: Well, you said you were planning to get married in the summer of 1996.
> A: Right.
> Q: Why did you make those plans?
> A: Because Robert was the love of my life. Everything was Robert. And I wanted to have a wedding.

1. Although the question of Watson's marital status is central to this motion, the court will refer to her as "Watson" throughout its discussion, which the parties have done as well.

Q: You wanted to formalize things?

A: Yeah.

Pl. Mot. Ex. I, 148–49.

In 1991, Robert and Debbie Sue Platt had their fifth child, Jade, and their divorce was not final until March of 1992. *See id.* Exs. C, D. Following Kristina's birth in 1989, Watson and Platt at times lived together and at times lived apart, at numerous locations; Watson usually maintained a separate residence from Platt, but kept possessions at Platt's residence. *See id.* Exs. E, F, I, J, K; Def. Resp. Ex. 2. Watson would sometimes use Platt's name and, at other times, use her own. *See id.* Ex. I; Def. Resp. Ex. 4. Platt and Watson had frequent separations and reconciliations:

Q: Did you and he continue to live together, whether it was there or somewhere else, [after Kristina's birth] until the time of Ken Sternberg's shooting in December of '95?

A: Yes, as long as the fighting didn't start. When the fighting started, I took my suitcase and Tina and we split up for a while so there's no fighting with the baby around. I don't like fighting with the baby around.

Q: Would you say there were occasional separations over the years?

A: Maybe a week or two, then we were back together, just to keep it calm, because I didn't want the baby all upset. . . .

Q: You lived together in various locations, correct?

A: Correct.

Q: Until he went to jail?

A: Correct.

Q: And, occasionally, there would be separations during that period of time, correct?

A: Correct.

Q: Were any of those longer than a week or two?

A: One was.

Q: What was the long one?

A: it might have been the summer, like two months?

Q: Do you remember when that was?

A: No. It's because I got—well, I don't remember what it was—when it was, but I know why I left, because I got beat up real bad, so I left with the baby.

Q: Did he do that?

A: Yeah. I just took the clothes and left everything there and I left, took the baby. We were going to counseling then.

Def. Resp. Ex. 2, 30–32.

Watson sought a Protection from Abuse order against Platt as well as instituting a child custody proceeding against him; a one year restraining order against Platt was entered in June 1994. *See* Pl. Mot. Exs. E, F, J. The Protection from Abuse order states: "The respondent [Platt] denies and the court makes no finding of fact as to the truth of any of the allegations in the petition for protection from abuse. The respondent agrees that this order be entered in that he does not want to have any future involvement or contact with Kathleen Watson." *Id.* Ex. F. Platt also claims that Watson would institute child support actions as a way of reuniting them as a couple: "[W]hat it is is I would stay away from her, and that was her way of getting us back in the room together or get us back somewhere together." *Id.* Ex. J. The two attended joint counseling sessions to address their problems at various points in their relationship. *See id.* Ex. J.

Platt and Watson discussed getting married while he was in prison, and he occasionally sent her letters addressed "to my wife." *See id.* Ex. I. Watson subscribed to "Bridal Guide," and the two were planning on getting married in 1996. *See* Def. Resp. Exs. 2, 7. Some of their friends in what Sternberg describes as the "truck pull" or "motorhead" community considered them to be husband and wife, and Platt would refer to Watson as "the wife" to certain of his friends. *See* Pl. Mot. Ex. M; Def. Mot. Exs. 8, 9, 12, 14.[2]

2. As Joseph Smith states in his affidavit: Bob, Kenny, me, some other guys, were into cars, and hung out—and wherever Bob was Kathy was not far behind, like a coattail. Even at Kenny's house when we were hanging out, she was always there—she was never satisfied, they fought a lot—it seemed to me that they were like a married couple, she drove him up a wall—all the guys that hung out felt the same way.

Watson wore a ring on her left hand that she told people was from Platt. *See id.* Ex. J, M. Watson received mail addressed to "Kathy Platt" and used the name Kathy Platt on Kristina's insurance policies and medical documents. *See* Def. Resp. Exs. 5, 6, 7, 9, 10, 11, 15.

In 1993, Robert Platt bought his residence, and it has always been in his name alone. *See* Pl. Mot. Exs. I, J. Watson's name has never been included on the deed to the residence, and she offered the following explanation why Platt bought the residence in his name only:

> [b]ecause of all the fighting. If I left, he just wanted the house to stay in his name in case it ever totally ended. And I agreed with that. I have no—because I knew every time I leave I end up coming back.... So,—well my way is, if I left for good, permanently, then there's no headache with a house or nothing, it just stays Robert's. Because when I leave, there's no problem. Robert takes care of Kristina. Robert takes care of me. I'm not worried about having to take him to Court or do anything. And this way, if something every happened to Robert, there's a house that, if the kids ever needed a place

I don't remember if I ever heard him say anything about her being his wife, but what I've said is what I thought, what it seemed like to me ... but they were like every other married couple I know, fought all the time.... Def. Resp. Ex. 8.

3. Platt claims that Watson was living in his house without his permission and denies that any ceremony between the two ever took place. Pl. Mot. Ex. J. He also had the following to say as to their standing as a "married" couple in the community:

> Q: Did you used to tell people that you were married to Kathleen Watson;
> A: No.
> Q: To your knowledge, did Kathleen Watson used to tell people that you and she were married?
> A: Yes.
> Q: Who did she tell that to?
> A: I guess anybody that had an ear.
> Q: Did you ever ask her why she was telling people you were married when you weren't?
> A: Not that I recall specifically, no.
> ...
> Q: Did you ever give Kathleen Watson a ring?
> A: No.
> Q: Did she used to wear a ring on the ring finger of her left hand?
> A: Yes.

to live, the kids could go live in the house. So we just left it as Robert's name, but I considered it my house, because he asked me if I wanted that house, and I said I wanted that house. I picked the house out.

*Id.* Ex. I. at 35.

On July 5, 1995, Platt was arrested for shooting a third person with no connection to the instant litigation or the underlying state court action at issue in this case. *See id.* Ex. I. After Platt was arrested, Watson moved into the residence with her daughter, Kristina, and Platt's daughter April. *See id.* Ex. I.[3] Platt had entrusted her with renting out the apartment in the house prior to his arrest. *See* Def. Resp. Ex. 3. She remained in Platt's house after he was incarcerated; she paid bills, acted as a landlord to the tenant, and tried to maintain and keep up the house. *See* Pl. Mot. Ex. I; Def. Resp. Ex. 3. Platt and Watson did not maintain any joint checking accounts, and she was never listed as a dependent on the tax returns, but the two had a joint credit card account, and certain of Platt's vehicles were listed in Watson's name, as he did not have a valid driver's license. Def. Mot. Exs. J, M; Pl. Resp. Ex. 2.[4]

> Q: What kind of ring was that?
> A: A ring that she bought out of mail order, one of them cubic zirconias or something.
> Q: Did she tell people that you gave her that ring?
> A: Yes.
> Q: Did you ever ask her why she did that?
> A: Yes.
> Q: What did she say?
> A: There was no answer.
> Def. Mot. Ex. J. 57–59.

4. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn therefrom in favor of the non-moving party. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987);

*Discussion*

In sum, State Farm disputes whether Kathleen Watson qualifies as an insured under Robert Platt's homeowner's insurance policy. Watson is considered an insured if she can be deemed a spouse, so the question for the court is to determine whether a common law marriage existed between Watson and Platt. *See, e.g., Ranger Ins. Co. v. General Accident Fire & Life Assur. Corp.*, 800 F.2d 329, 330 (3d Cir.1986); *cf. Scott v. Bd. of Trustees of the Mobile S.S. Ass'n*, 859 F.2d 872, 874 (11th Cir.1989) (express exclusion of common law marriages in insurance policies void as against public policy when state law recognized parity of common law and ceremonial marriage).

■ Pennsylvania recognizes the validity of common law marriages, and the burden of proving a common law marriage is on the purported spouse. *See In re Gavula*, 490 Pa. 535, 417 A.2d 168, 171 (1980). In Pennsylvania, marriage is a civil contract made between parties with the capacity so to contract. *See In re Garges*, 474 Pa. 237, 378 A.2d 307, 308–309 (1977). As might be expected, one whose previous marriage has not been dissolved is incapable of contracting to marry another. *See id.* Given that proving the existence of a marriage contract is difficult absent the standard ceremonial formalities, Pennsylvania law has set forth certain rules and presumptions to aid courts in determining whether a common law marriage has been formed. *See id.* at 309. In general, a common law marriage requires *verba de praesenti*, or words in the present tense uttered for the purpose of establishing the relationship of husband and wife. The words need not be formalized. Word of taking or explicit performative utterances, such as "I take you to be my wife" or "I hereby marry you" are unnecessary. All that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time. *See Garges*, 378 A.2d at 309.

■ In light of the difficulties involved in proving a common law marriage, the law has created a rebuttable presumption of marriage where two absolutely essential elements co-exist, namely: 1) constant cohabitation between a man and a woman, both of whom have the capacity to be married; and 2) general, as distinguished from partial or divided, reputation as husband and wife in their community. *See In re Gavula*, 417 A.2d at 171 n. 7; *Garges*, 378 A.2d at 309; *see also McKenzie v. Harris*, 679 F.2d 8, 10–11 (3d Cir.1982) (no *verba de praesenti*, but evidence of intention to be married and reputation and cohabitation evidence sufficient to support finding of common law marriage); *Commonwealth v. McLean*, 387 Pa.Super. 354, 564 A.2d 216, 220–221 (1989) (finding that a common law marriage is evidenced from *verba de praesenti* or, that cohabitation and reputation are circumstances from which the existence of a contract of marriage can be inferred, but that the requirements are not conjunctive). However, the standard presumption of marriage based on cohabitation and reputation does not apply if the relationship between the parties began while at least one party was married to a third person; in this instance, the courts will presume that the parties continued to live together even after the impediment to their marriage was removed, and clear and convincing evidence of a change of status—from

*Baker v. Lukens Steel Corp.*, 793 F.2d 509, 511 (3d Cir.1986). In other words, if the evidence presented by the parties conflicts, the court must accept as true the allegations of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the movant does not have the burden of proof on the underlying claim or claims, that movant has no obligation to produce evidence negating its opponent's case, but merely has to point to the lack of any evidence supporting the non-movant's claim. When the party moving for summary judgment is the party with the burden of proof at trial, and the motion fails to establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented. *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir.1992). The parties agree that Pennsylvania law controls the issues raised in this case, and the court sees no reason to disturb that determination. *See Visiting Nurse Ass'n v. St. Paul Fire & Marine*, 65 F.3d 1097, 1099–1100 (3d Cir.1995); *McMillan v. State Mutual Life Assurance Co. of America*, 922 F.2d 1073, 1074 (3d Cir.1990).

unmarried to "married"—is required to rebut this presumption. *See Garges,* 378 A.2d at 309.[5]

■ From the inception of their relationship, in the late 1980's, through March of 1992, Watson and Platt could not enter into either a common law or a traditional marriage. As such, their ceremony in 1989 is a nonentity, and Watson must produce evidence to overcome the presumption of their unmarried status. As a result, the more difficult question is how to interpret their relationship between 1992 and the present. Watson has not produced evidence of *verba de praesenti* after 1992. The record presents indicators of a general reputation of marriage between Platt and Watson. Watson told persons that they were married and used Platt's name, Watson wore a ring on her left hand, Platt referred to Watson as his "wife" on several occasions, and a number of their friends and acquaintances believed them to be married. However, the intermittent nature of their relationship, as expressed through court actions, separate residences, frequent name changes, and frequent separations, resulted in a deferral of the change in status that Pennsylvania law requires in a case such as this one. More precisely, according to Watson, she and Platt planned to be married in 1996, and marriage was discussed at other points in time between the two, but these plans always broke down in the midst of their conflicts. *See* Pl. Mot. Ex. I; Def. Resp. Ex. 2. Given the nature of their relationship, it appears that the permanence of marriage was a step that they were, as a couple, not able to take: the two either deferred that step to a future date or ultimately rejected it as a result of their disagreements. *See* Pl. Mot. Ex. I; Def. Resp. Ex. 2.

■ It is difficult for this court, in light of the heavy burdens Watson faces in proving a common law marriage under Pennsylvania law, the factual posture this case presents, and the nature of the record before it, to find a true question of material fact for the jury. Accordingly, the court finds that Watson and Platt did not have a common law marriage, that Watson does not qualify as an insured under Platt's homeowner's policy, and that partial summary judgment is appropriate.

---

5. The Pennsylvania courts have continued to apply the common law rules to assertions of common law marriage status, even in the face of changing social mores. *See, e.g., In re Cummings Estate,* 330 Pa.Super. 255, 479 A.2d 537, 542 n. 2 (1984).