**Dawn McMILLAN and Devin McMillan, a minor by his legal guardians, Barbara S. Ford and Edward Ford, Jr.**

v.

**STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA.**

**Appeal of TRANS WORLD AIRLINES, INC.**

**Nos. 90–1462, 90–1463.**

United States Court of Appeals, Third Circuit.

Argued Nov. 13, 1990.

Decided Dec. 28, 1990.

Harvey Bartle, III (argued), Jeffrey M. Jacobson, Dechert Price & Rhoads, Philadelphia, Pa., for appellants.

Michael–John Goodnow (argued), Sidney H. Black, Ltd., Philadelphia, Pa., for appellees.

Before STAPLETON, HUTCHINSON, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal raises the subtle and novel question whether the phrase "on authorized business" in an insurance policy can be interpreted reasonably to apply to an employee who has completed her work shift but not yet left the employer's premises. Plaintiffs are the children of Alma McMillan (McMillan), who was murdered by her estranged husband as she was leaving the business premises of her employer, defendant Trans World Airlines, Inc. (TWA). They filed their diversity action in the United States District Court for the Eastern District of Pennsylvania to collect a $100,-000 benefit under an insurance policy issued by the defendant State Mutual Life Assurance Company (State Mutual) to the employer in favor of its employees. Following cross motions for summary judgment, the district court granted the plaintiffs' motion. The defendants appealed. We affirm.

### I.

The straightforward facts underlying plaintiffs' insurance claim are undisputed. At the time of her death, McMillan served as a sales and reservations supervisor for TWA at their offices located in the Rohm & Haas Building, Sixth and Market streets, Philadelphia. At 10:00 p.m. on November 25, 1987, McMillan concluded her work shift. She left her office on the third floor several minutes later, descended to the first floor, and exited the lobby onto a covered walkway connected to the office building. According to police reports, at about 10:15 p.m., McMillan's estranged husband fatally stabbed her while she stood on this walkway. Approximately one hour later, her body was discovered lying at the top of the steps leading from the walkway to the public sidewalk. The police subsequently apprehended McMillan's husband who, after giving the police a full confession, was convicted of her murder.

As a TWA employee, McMillan received a group life insurance policy issued by State Mutual which, under the provision marked "Hazard F," provides for a payment of $100,000 to the insured's beneficiaries in the event of death resulting from "a felonious assault while on authorized business of [TWA]." The policy defines the terms "felonious assault" to include, *inter alia*, robbery, assault and battery, kidnapping, bombing, terrorism, and murder. Regrettably, however, the policy is silent as to the definition or meaning of the critical phrase, "on authorized business."

The district court held that McMillan was on authorized business of TWA at the time of her fatal assault.

### II.

Disposition of an insurance action on summary judgment is appropriate, when, as here, there are no material underlying facts in dispute. *Little v. MGIC Indemnity Corporation,* 836 F.2d 789, 792 (3rd Cir.1987). The only contested issue involves the interpretation of the scope of coverage of an insurance contract, a question of law over which our review is plenary. *Id.; Pacific Indemnity Company v. Linn,* 766 F.2d 754, 760 (3rd Cir.1985). Under Pennsylvania's choice of law principles, we look to the law of Pennsylvania, the state where the policy of insurance was

contracted and delivered, for guidance in construing State Mutual's policy. *Faron v. Penn Mutual Life Ins. Co.*, 176 F.2d 290, 292 (3rd Cir.1949).

■ We first consider defendants' contention that the district court, in holding that McMillan was "on authorized business" of TWA when she was assaulted, failed to give effect to that phrase's plain, unambiguous meaning. Under Pennsylvania law, where the language of an insurance policy is unambiguous, a court must enforce the clear meaning of that language. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). In addition, a court must refrain from torturing the language of a policy to create ambiguities where none exist. *Houghton v. American Guaranty Life Ins. Co.*, 692 F.2d 289, 291 (3rd Cir.1982).

However, if the policy provision is reasonably susceptible to more than one interpretation, it is ambiguous. *Little*, 836 F.2d at 793; *see also Celley v. Mutual Benefit Health & Accident Association*, 229 Pa.Super. 475, 481–82, 324 A.2d 430, 434 (1974) (holding that a "provision of an insurance policy is ambiguous if reasonably intelligent men ... would honestly differ as to its meaning"). Ambiguous provisions in an insurance policy must be construed against the insurer and in favor of the insured; any reasonable interpretation offered by the insured, therefore, must control. *See, e.g., Little*, 836 F.2d at 793; *Standard Venetian Blind*, 469 A.2d at 566; *Mohn v. American Casualty Co.*, 458 Pa. 576, 586, 326 A.2d 346, 351 (1974). Courts in Pennsylvania have applied this rule liberally.[1]

Courts have offered two pragmatic justifications for this rule of interpretation. One is that insurance policies are not ordinary contracts but are contracts of adhesion between two parties not equally situated and thus equity requires their interpretation in favor of the weaker party. The insurer is an expert in its field "and its varied and complex instruments are prepared by it unilaterally whereas the assured ... is a layperson unversed in insurance provisions and practices." *See, e.g., Allen v. Metropolitan Life Ins. Co.*, 44 N.J. 294, 208 A.2d 638, 644 (1965). The second is an application of the familiar contract rule interpreting ambiguity against the scrivener, recalling the hoary maxim *ambigua responsio contra proferentem est accipienda.*[2] The Pennsylvania Supreme Court justified adopting this rule when, upon considering an insurance provision in which ambiguity was dispersed "like ink poured into a fish bowl, clouding the identity of its swimming occupants," the court reasoned that:

> The person who writes with ink which spreads and simultaneously produces two conflicting versions of the same proposition cannot complain if the person affected by both propositions chooses to accept that which is more helpful to him and which is against the interests of the contract writer.

*Sykes v. Nationwide Mutual Insurance Co.*, 413 Pa. 640, 643, 198 A.2d 844, 845 (1964). *See also* 6B Appleman, Ins. L. & P. § 4254 (1979).

State Mutual appears to have drafted the term "on authorized business" with spreading ink. Significantly, it defined the term "felonious assault" but the related and operative phrase, "on authorized business" is nowhere defined in the policy. Absent specific definition, the common meaning of the words themselves are open-ended. Considered individually, the word "business" is certainly not self-clarifying: its meaning can be either broad or narrow. Indeed, it

---

**1.** *See, e.g., Little v. MGIC Indem. Corp.*, 836 F.2d 789, 794 (3rd Cir.1987) (ambiguous phrase defining which costs insurer was "legally obligated to pay" construed in favor of insured); *Pacific Indem. Co. v. Linn*, 766 F.2d 754 (3rd Cir.1985) (exclusion in policy deemed inapplicable because terms "operation," "professional service," and "Physicians Offices" were undefined and capable of more than one reasonable interpretation); *Mohn v. American Casualty Co. of Read-ing*, 458 Pa. 576, 586, 326 A.2d 346, 352 (1974) (declining to accept insurer's narrow and restricted interpretation of "accidental bodily injury"); *Sykes v. Nationwide Mutual Ins. Co.*, 413 Pa. 640, 642–43, 198 A.2d 844, 845 (1964).

**2.** "An ambiguous answer is to be taken against him who offers it."

is hard to imagine a word with more varied uses in our society. For example, one's "business" can refer commonly to the totality of one's regular, directed behavior (as in the clause "he makes it his business to read the sports page first every morning") or can be used to identify only those tasks which generate pecuniary gain, which occupy the time, attention, or labor of men and women for livelihood or profit. *See Fine v. Barry and Enright Productions,* 731 F.2d 1394, 1397 (9th Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984). Webster's Dictionary contains no less than ten definitions of the word "business" ranging from the very inclusive "purposeful activity" to the more restrictive "a commercial or industrial enterprise." *Webster's Third New International Dictionary* 302 (1966). Similarly, in common usage, the meaning of "authorized" can be construed narrowly to identify only those actions taken pursuant to some formal imprimatur or broadly to include any activity which is not specifically prohibited.

A moment's consideration of the varying breadth of meanings reasonably attributable to "authorized business" in the context of an employer's enterprise demonstrates the variety of activities which this phrase's freely flowing ink touches. On the one hand, it can be understood to embrace only those assigned tasks being pursued by employees during specified work hours. On the other hand, it can extend to all activities engaged in by employees during regular work hours regardless of their relation to the employer's enterprise, as, for example, a lunch period or a physical exercise program provided by the employer. Yet again, in a broad sense, the phrase can be construed reasonably to encompass any and all actions taken by employees which benefit an employer's enterprise and are not prohibited, whether or not they occur during work hours or at the work place.

Thus, one is left to speculate whether "on authorized business" may encompass employees who take five minutes out of their regular shift to work on a crossword puzzle or attend to some personal matter; workers who have completed their shift but who run an errand for their supervisor on their way home; or employees who take training courses during their personal time to better equip themselves to serve their employer's operations. Law students in a first year torts class no doubt could generate endless variations on this theme, but taken together the resulting refrain resounds clearly with a unified voice: the meaning of "on authorized business" is not self-evident.

Moreover, State Mutual's insurance contract as a whole does not provide the court with any additional tools to tease out the cited phrase's alleged plain meaning. Neither the context of the rest of the policy nor any other evidence extrinsic to the phrase itself renders the meaning of "on authorized business" more conspicuous. Although several other provisions of the policy employ the phrase "on business," in each instance the phrase is used to indicate activities of employees who are off work premises on travel on behalf of the enterprise.[3] In contrast, Hazard F does not qualify "on authorized business" by reference to travel away from the work place or by any other more specific intention. Thus we conclude it was meant to have a more general definition.

 The burden of drafting with precision rests with the insurance company, the scrivener of the policy. If State Mutual desired to limit its liability under Hazard F of the policy to only those felonious assaults committed during a period identified

---

**3.** Defendants argue that because "on business" is defined in another section of the policy specifically to provide coverage for employees' travel to and from their homes, the use of "authorized business" in Hazard F cannot similarly be understood to justify protection of employees who are leaving work to return home on completion of the work shift. As noted above, the "business" indicated in the other policy sections specifically refers to work activities away from the business premises, whereas "authorized business" in the cited section here obviously has a more general meaning. The inclusion of additional language in the other provisions expressly indicating that travel to and from home is covered by the policy only demonstrates how the phrase "on business" is capable of being used appropriately to describe varying situations. It supports our conclusion that the term is not self-defining.

by the most restrictive understanding of "on authorized business," it was certainly at liberty to adopt more precise language to accomplish that purpose. An insurer's failure to utilize more distinct language which is available reinforces a conclusion of ambiguity under Pennsylvania law. *Celley*, 324 A.2d at 435.[4]

Having concluded that the meaning of TWA's "authorized business" is not clear in the insurance policy, we must determine whether any reasonable construction of that phrase could apply to the insured at the time of her death. Our task is not to determine the *most* sensible interpretation of the phrase, but only to ascertain whether any reasonable person upon reading "on authorized business" could decide that it encompassed McMillan as she left the work place shortly after completing her shift.

No Pennsylvania court has interpreted the phrase, "on authorized business." Lacking any decision by Pennsylvania's highest appellate court, we look to other sources for guidance. As we stated before,

> In the absence of any authoritative pronouncement from the state's highest court, the task of a federal tribunal is to predict how the court would rule. To make this prognostication, we are not inflexibly confined by dicta or by lower state court decisions, although we should look to such statements as indicia of how the state's highest court might decide. [Citation omitted.] The policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies and the decisions of other courts may also inform our analysis.

*Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 910 (3d Cir.1985), *quoting Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981). No other court has yet undertaken to construe this phrase in a contract for insurance. Thus, we write on a clean slate.

The defendants argue that the only permissible reading of "on authorized business" is a narrow one comprising only those specifically assigned tasks carried out by employees during their working hours. Thus, at oral argument, counsel for defendants asserted that under the supposedly plain meaning of this phrase, an employee who paused during her work shift to do a crossword puzzle would not be "on authorized business" of her employer. The insurance company's attempt to dictate narrowly the meaning of undefined, ambiguous words after it uses them is reminiscent of a similar prerogative claimed by Humpty Dumpty in the Lewis Carroll classic.

> "I don't know what you mean by 'glory,'" Alice said.
>
> Humpty Dumpty smiled contemptuously. "Of course you don't know—till I tell you. I mean 'there's a nice knockdown argument for you.'"
>
> "But 'glory' doesn't mean 'a nice knockdown argument,'" Alice objected.
>
> "When *I* use a word," Humpty Dumpty said in rather a scornful tone, "it means just what *I* choose it to mean—neither more nor less."

*Through the Looking Glass*, in *The Complete Works of Lewis Carroll* 196 (1939).

State Mutual's arguments, like Humpty Dumpty himself, must inevitably fall apart. An employer's legitimate business concerns commonly extend beyond its employees' assigned tasks during work hours and may include anything that an employer expects or requires of its employees, whether expressly stated or implied. Indeed, a broad understanding of "on authorized business" reasonably could include work procedures, pre-work preparation, such as dressing in work uniforms, preparation of equipment, participation in employer-sponsored recrea-

---

**4.** The dissent would restrict the meaning of the term "on authorized business" by using the definition of the more narrow phrase *"actually engaged* in the *furtherance* of *the* business," contained in the Pennsylvania Workmen's Compensation Code. 77 P.S. § 411 (emphasis added). Thus, in contravention of the well-established rule denying to the scrivener of a policy the benefit of the construction of terms of coverage more favorable to it than those provided clearly in the policy itself, the dissent would impute to State Mutual the benefit of qualifying language which it chose not to adopt.

tion, and other established courses of conduct, although not occurring during work hours or at the work place. Indeed, Pennsylvania courts, in construing the phrase "in furtherance of the employer's business," have adopted such a broad understanding of "business." [5]

Like most employers, TWA maintains a work schedule to ensure that the proper number of its employees are present to cover the many assignments necessary to run an airline. Consequently, its workers must report to and depart from work at their appointed hours in accordance with this timetable. Employees who fail to show up or who arrive at the wrong time seriously undermine TWA's enterprise. Likewise, workers who refuse to leave work at their shift's conclusion, who loiter and possibly distract their co-workers, similarly impede the business. TWA anticipates and authorizes its workers' observance of such procedural practices, depends upon them, and requires its employees to follow them.

Thus, when McMillan left the office shortly after completing her shift, she was expected and authorized to do so by the procedural practices of TWA's enterprise. Indeed, she had no choice: she was required to leave. But just how far did the line connecting McMillan to her employer's demand for observance of the work schedule extend? McMillan, of course, could not credibly be deemed to have been on TWA's authorized business from the moment she punched out until the next time when she reported again for work. There must be some instant following the conclusion of an employee's work shift when her separation from the authorized business is complete. We conclude that the earliest point of separation from her employer's "authorized business" could have occurred only once McMillan had fully left TWA's business premises, because until that point she

would be found to be in an area required by her employer and for its benefit. Just as her entry to the work premises for the purpose of commencing an employee's duties is required by the authorized business of the employer, the employee continues to be "on authorized business" until the premises are exited in the regular course of daily duties. The employee cannot be said *ipse dixit* to commence or consummate her work duties only at the moment she enters or leaves her work station. The process of arriving at the work station from the moment an employee enters the employer's premises and leaving the work station until the employee exits the employer's premises are reasonably part and parcel of the authorized business of the employer.

We look to Pennsylvania's Supreme Court for aid in fixing the boundaries of the term "employer's premises." The Pennsylvania Supreme Court has held that under Pennsylvania Workmen's Compensation Law, an employer's premises include all the area which an employee is required to traverse to access the work site, regardless of who actually owns or controls the area. *Epler v. North American Rockwell Corp.*, 482 Pa. 391, 399, 393 A.2d 1163, 1167 (1978) (parking lot near work site held to be employer's premises); *Brown v. W.C.A.B. (Transworld Airlines)*, 505 Pa. 35, 476 A.2d 900 (1984). Upon concluding that an employee who slipped and fell on the first-floor landing of a multipurpose commercial building was on the "employer's premises," then Justice Hutchinson, of the Pennsylvania Supreme Court, now Judge Hutchinson of this court, stated:

> Our cases have for many years defined the employer's premises to include public or common areas used in the conduct of the employer's affairs, so long as the

---

**5.** Pennsylvania courts have held the following employee activities to be in furtherance of the employer's business: playing basketball with other employees during the lunch hour, *Hemmler v. W.C.A.B. (Clarks Summit State Hospital)*, 131 Pa.Cmwlth 24, 569 A.2d 395, 397 (1990); cleaning company equipment at home, *Montgomery County Sheriff's Dep't v. W.C.A.B.*

*(Riehl)*, 125 Pa.Cmwlth 6, 556 A.2d 962, 965 (1989); playing on a company-sponsored softball team, *Scott v. W.C.A.B. (Packaging Corp.)*, 113 Pa.Cmwlth 80, 536 A.2d 492, 495 (1988), and test-driving a company snowmobile at home, *Artrip v. W.C.A.B.*, 54 Pa.Cmwlth 502, 421 A.2d 1254, 1257 (1980).

employe's presence thereon was required by the nature of his employment.

*Brown*, 476 A.2d at 902 (citations omitted).[6] This definition of "premises" represents the majority rule in other jurisdictions. *See Epler*, 393 A.2d at 1167, n. 2 (Pomeroy, J., concurring).

Thus, McMillan was not free of her employer's requirements and not severed from its authorized business, at least until the moment when she would have reached some public thoroughfare and regained the unimpeded freedom to choose her next course of direction. Until she reached this point of departure, she reasonably was on authorized business of her employer. We therefore conclude that the time and transitional effort of an employee from the minute the employee enters the work premises in preparation for and reaching the work station, whether or not paid for, and the time regularly spent in preparation for departure and reaching the public thoroughfare would be held by the Pennsylvania Supreme Court to be reasonably included in the broad definition of "on authorized business."

McMillan never reached the instant of separation from TWA's business. Tragically, she met her untimely end while standing upon a walkway which she was required to pass over by her employer at a time dictated by her employer's schedule and for its benefit, making it reasonable to conclude that she was on her employer's authorized business when assaulted.

In his confession to police, McMillan's husband stated that he knew at what time McMillan would finish work because she always did so at the same time; that he went to the location on the enclosed passageway where he knew she would exit at approximately 10:15 p.m., arriving at just the moment when McMillan emerged from the lobby. Thus, McMillan's consistent observance of TWA's work schedule directly facilitated her murder that night. This causal connection between McMillan's work departure at the time and place designated by TWA and her assailant's foul plan to meet her at that moment further bolsters our conclusion that she was on TWA's authorized business at the time.

■ Furthermore, the conclusion that "on authorized business" could include employees who, having recently punched out are still on the business premises, finds additional support in the definition of the phrase "in the course of employment" as interpreted by Pennsylvania workmen's compensation law.[7] 77 P.S. § 411. The district court correctly found that Pennsylvania workmen's compensation law defines this phrase to include employees who have been injured while still on an "integral part of the employer's operating premises," within a reasonable time after the work period ended.[8] *Newhouse v. Workmen's*

6. *See also Fashion Hosiery Shops v. Workmen's Compensation Appeal Board,* 55 Pa.Cmwlth 465, 423 A.2d 792, 797 (1980) (entranceway in front of one of the doors to employer's building held to be employer's premises).

7. The district court interpreted State Mutual's policy to expressly invite this reliance upon the Pennsylvania Workmen's Compensation Code, by stating in Hazard F, "The criminal and civil codes of the jurisdiction wherein such activity or attempt was perpetrated shall be the basis for interpretation of the terms used herein." We agree with defendants that this phrase was intended to mean that the conduct included in the definition of "felonious assault" immediately preceding should be defined by reference to the state criminal and civil code. As such, it does not invite the court to interpret *all* of the terms used in this provision, including "authorized business" by reference to the Pennsylvania Code. However, the court does not need such a specific invitation. Because the insurance policy generally is to be construed according to Pennsylvania law, the court should utilize *any* relevant source which may shed light on the contract's meaning.

8. As defendants point out, plaintiffs here could not have collected workmen's compensation under the facts of this case. Pennsylvania provides compensation for "accidents" defined so as not to include attacks motivated by personal animus. *Mike v. Borough of Aliquippa,* 279 Pa. Super. 382, 421 A.2d 251, 253–54 (1980). Hazard F of State Mutual's policy, however, does not intend to exclude injuries from felonious assaults occurring due to personal reasons. We reject defendants' argument suggesting we should refer to Pennsylvania workmen's compensation as the whole measure of their liability to plaintiffs: we merely refer to that part of it which sheds light on the phrase "on authorized business."

*Compensation Appeal Board,* 109 Pa. Cmwlth 96, 530 A.2d 545, 547 (1987), *app. denied,* 517 Pa. 627, 538 A.2d 879 (1988). In *Newhouse,* the court held,

> Even though not actually engaged in the employer's work, an employee will be considered to have suffered an injury "in the course of employment" if the injury occurred on the employer's "premises" at a reasonable time before or after the work period.

*Newhouse,* 530 A.2d at 547 (citation omitted). The court further held that fifteen minutes after "punching out" is a reasonable time after the work period. *Id.; see also Workmen's Comp. App. Bd. v. United States Steel Corp.,* 31 Pa.Cmwlth 329, 376 A.2d 271 (1977) (employee who had a car accident in the parking lot of his employer forty-five minutes before he was scheduled to commence work found to be in the course of employment).

### III.

In sum, we conclude that the Pennsylvania Supreme Court would hold that the phrase "on authorized business" in the defendant's policy is ambiguous and must be interpreted in favor of the plaintiffs, and that a reasonable person could conclude McMillan, who was still on her employer's premises shortly after completing work, was "on authorized business" of TWA at the time of her assault.

Accordingly, the judgment of the district court will be affirmed.

STAPLETON, Circuit Judge, dissenting.

I respectfully dissent.

In normal parlance, the concept of doing the employer's business and the concept of being on the employer's premises are distinct. One can be off the premises, but still be on the authorized business of the employer; and one can be on the premises, but not be on the authorized business of the employer.

As a matter of policy, one may justifiably hold an employer responsible for compensating employee injuries that occur on its premises even when the injured employee was not doing the employer's business at the time of the injury. The employer is in control of its premises and should provide a safe place to work. For this reason, the Pennsylvania legislature, when drafting that state's workmen's compensation statute, fashioned a two-pronged standard: compensation must be paid both when the employee is engaged "in the furtherance of his employer's business" *and* when the employee, even though not so engaged, (1) is on the employer's premises, (2) is required by the nature of his employment to be there, and (3) is injured by the condition of the premises or by operation of the employer's business or affairs thereon. 77 Pa. Stat.Ann. § 411(1) (Purdon Supp.1990). The important thing to note for present purposes is that the Pennsylvania legislature found it necessary to go beyond the "in furtherance of the employer's business" standard in order to implement the policy decision it had made regarding the scope of workmen's compensation benefits. The operation of the Pennsylvania statute in an analogous fact situation helps to illustrate the point. In *Penn Pad Co. v. Workmen's Compensation Appeal Board (Altholz),* 83 Pa.Cmwlth. 490, 478 A.2d 497 (1984), an employee had been injured while changing in the employer's locker room after completing work for the day. The Commonwealth Court held that the employee was not "engaged in furtherance of his employer's business," and that his injuries would be compensable only if he could meet the standard applicable to injuries suffered on the employer's premises. *Id.* 478 A.2d at 499.

The result reached by the majority in this case has surface appeal for the same policy reasons that prompted the Pennsylvania legislature to formulate the second prong of its definition of workmen's compensation benefits. Nevertheless, the fact that the Pennsylvania legislature found it necessary to formulate this second prong demonstrates that the normal understanding of an employee who is doing the employer's business does not include someone who has

completed his or her day's work and is on the way home.

The majority, I believe, would not reach the same result if this tragedy had occurred as McMillan was waiting on the public sidewalk for a commuter bus to take her home.[1] Yet the majority does not and cannot articulate a distinction between that situation and the one before us that makes sense in terms of the applicable standard—"on the authorized business of the employer." To be sure, the employer in both cases is deriving an indirect benefit from the employee's activity; employees can be of no value to their employer unless they get to and from their work stations each day. Nevertheless, the employee is no more or less "on the authorized business of the employer" in the bus stop case than in this case.

There may be situations in which the application of the standard selected by this insurer will be a debatable matter. In those situations, a court may appropriately apply the rule that ambiguities should be resolved against the insurer. Its application on these facts seems clear, however. At the time of the tragedy, McMillan was on her own business, not on the business of her employer. Therefore, I would reverse the judgment of the district court and remand with an instruction to enter judgment for TWA and State Mutual Life Assurance Company of America.

---

1. Under Pennsylvania's workmen's compensation statute, in such a situation, McMillan would be neither engaged in the furtherance of the employer's business nor on its premises as that concept is employed in the second prong of the test. *Serafin v. Workmen's Compensation Appeal Board,* 62 Pa.Cmwlth. 413, 436 A.2d 1239 (1981) ("[T]he law is clear that an employee who is injured while going to or returning from work, absent special circumstances, is not engaged in furthering the business of his employer.").